## NATIONAL LABOR RELATIONS. BOARD v. VAIL MFG. CO.

### No. 9107.

Circuit Court of Appeals,. Seventh Circuit.

Jan. 2, 1947.

Rehearing Denied Jan. 23, 1947.

. David A. Morse and A. Norman Somers, both of Washington, D. C., Francis X. Helgesen, of Buffalo, N. Y., and Gerhard P. Van Arkel, Gen. Counsel, Morris P. Gulshien, Associate Gen. Counsel, both of Washington, D. C., Owsley Vose, and Ben Grodsky, all of Washington, D. C., for petitioner.

Roy Massena and Kenneth G. Spaulding, both of Chicago, Ill. (John Harrington, of Chicago, Ill., of counsel), for respondent.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is a petition by the National Labor Relations Board, hereinafter called Board, pursuant to Sec. 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., for enforcement of its order entered March 31, 1945. The Board found that Vail Manufacturing Company, hereinafter called respondent, had discriminatorily discharged twenty-five employees in violation, of Sec. 8(1) and (3) of the Act and had engaged in other acts· of interference, re- ..

straint and coercion in violation of Sec. 8 (1) of the Act. Based upon these findings the Board entered its order requiring respondent to cease and desist from its unfair labor practices, to reinstate with back pay the employees discriminatorily discharged and to post appropriate notices.

The only questions presented for review are whether the Board's findings are substantially supported by evidence, and whether the order is valid.

Respondent is engaged in the manufacture and sale of coat hangers, paper clips, staples and related products, at Chicago, Illinois, where the alleged unfair labor practices occurred. It is conceded that respondent is engaged in interstate commerce and therefore subject to the Act.

In May, 1943, a union representative sought to interest respondent's employees in organizing. This came to the immediate attention of Walter Vail, president of respondent, who interrogated employee Hirschman relative to a union meeting and stated that he wanted to keep the company's labor relations on a stable basis and would close the doors rather than tolerate any other condition.

In late October, 1943, employees Carlson, Hirschman and one other inquired at the union office about organizing. Several meetings followed this inquiry with the result that a majority of the employees of respondent signed up with the union. A local of the union (United Steelworkers of America, C. I. O.) was formally established on November 21, 1943, and Hirschman and Carlson were among the officers elected. The following day the union wrote respondent requesting a bargaining conference for November 27, 1943, since it represented a majority of respondent's employees. Respondent failed to reply to this request and the union promptly filed charges with the Board.

President Vail was in Florida on vacation when the company received the bargaining request of the union, but upon notification of such request he immediately returned to Chicago, arriving November 25, 1943. President Vail commented upon the request thus: "We do not need anything like that. We can run our own business. They are nothing but a bunch of racketeers, just collecting the money and the workers get nothing in it." This feeling was almost immediately translated into action as Vail questioned a number of employees to ascertain the extent of and employee interest in the union. Within four days of Vail's return from Florida, beginning on November 29, 1943, and continuing through December 3, 1943, twenty-three employees were discharged—all union members, including Carlson and Hirschman, both of whom were extremely active in union affairs. No non-union employees were discharged.

Further, on December 2, 1943, one of the old employees, previously interrogated by Vail relative to union activities at respondent's plant, circulated a petition expressing loyalty to the company and hostility to the union, seeking signers in the plant during working hours. Many signers were obtained but in one department, the standard staple department, only four signers were obtained, two of whom were supervisory employees. When Vail received notice of this failure to obtain signatures, he stated to one of the supervisory employees, "the first thing to do would be to get rid of them," obviously meaning the non-signers. The next day thirteen union employees were discharged, three from the standard staple department. The day following these discharges one Monestere, vice-president of the union and of this same department, was discharged. Vail told Monestere at that time that the company would be closed down if the union came in. It is also pertinent to note that no person who signed the anti-union petition was discharged. The Board found, and we think rightly so, that the petition had the backing and the blessing of the respondent. This is so for the reason that the petition was circulated during working hours, signed by supervisory employees and no attempt was made by Vail to stop such circulation.

Vail further on December 4, 1943, while making a list of eligible voting employees for use in a coming election to be conducted by the Board, sought to list Frank Mastik and Joseph Mastik, who were in charge of the day and night shifts respectively

in the standard staple department and who the Board found were supervisory personnel, as operators. When the Mastiks were informed of this proposed listing they objected, both claiming that they were foremen. Vail told them the purpose of their being listed as operators was to get two votes against the union. When the Mastiks refused to go along with this classification, their employment was terminated.

■ We think that the above recital of facts is sufficient to show that respondent was guilty of restraint, coercion and interference in violation of Sec. 8(1) of the Act. Respondent's whole course of conduct was one intended to thwart or destroy union activities at its plant. This is emphasized by the fact that those discharged were extremely active in the union, some officers of the union, that no non-union employees were ever discharged during this period in question even though the union represented a bare majority, and that no signers of the anti-union petition were discharged while all who refused were discharged. The Board's finding of a violation of Sec. 8(1) is amply supported.

■ While the Board found that twenty-five employees had been discriminatorily discharged, respondent challenges such finding only as to seven. As to these, respondent seeks to have their discharges viewed in isolation, separate and apart from the background as set forth above. This we cannot do. We must view the entire scope of the labor dispute in order to determine properly whether the employees in question were discriminatorily discharged.

■ Respondent has divided the employees into two groups—production and supervisory—for the purposes of their argument, and for convenience we will do the same. Respondent contends that as the five production employees were discharged on November 29, 1943, anything taking place after that time is not pertinent to their discharge; that the discharges were made upon a seniority basis, and that wartime restrictions necessitated a curtailment of the respondent's employees. Standing alone, without any-

thing further, these reasons given for discharges are perfectly valid, but when this record is viewed in its entirety, the conclusion is inescapable that these were not the real motivating factors behind the layoffs. In view of the active and energetic anti-union campaign conducted by management, the Board properly found that the discharges were but part of a design to eliminate the union, made because the employees were members of a union and active therein. As previously stated, the entire course of conduct must be taken into consideration when studying the propriety of the discharges, and therefore the contention that events subsequent to some discharges cannot be considered in connection therewith must be overruled. The Board's finding of illegal discharge as to the five production employees is sufficiently supported.

■ The remaining two discharges contested by respondent are those of Frank and Joseph Mastik, supervisory employees in the standard staple department. There is a conflict in the evidence as to whether these employees were discharged or resigned. Frank Mastik testified that he and his brother were discharged for failure to agree to a request by Vail that they be classified as operators instead of foremen, for the purpose, as Vail put it, of voting against the union. The Board credited his testimony and it is sufficient to sustain the Board's finding of a wrongful discharge, that is, a discharge for refusing an improper classification in order to swell the anti-union vote. The Board's finding that the Mastiks were discharged in violation of Sec. 8(1) must be sustained.

■ Respondent challenges the finding that these discharges were also a violation of Sec. 8(3) of the Act. Its contention is that the discharges did not encourage or discourage membership in a labor organization. The only basis for such contention is lack of knowledge of such discharges on the part of other employees. The Board inferred, however, under the circumstances of the case that the other employees would have this knowledge. We cannot say that such an inference is unreasonable. With such knowledge, the other employees would

have every good reason to fear the same treatment meted out to the Mastiks if they showed a friendly attitude toward the union. The Board's conclusion that there was an 8(3) violation is proper. But whether this be true or not, the Board's order of reinstatement and backpay as to the Mastiks would have to be sustained. We have approved the Board's holding that the discharge of the Mastiks was a violation of Sec. 8(1) and the Board concluded that on that alone the Mastiks should be re-employed and receive back pay in order to effectuate the policies of the Act. This finding is not unreasonable and must be accepted.

Respondent urges that the Board has no authority to order reinstatement to jobs which no longer exist. No such issue was raised before the Board and it was raised in this court for the first time on oral argument. We cannot assume that the Board will be so arbitrary as to insist that respondent take back employees whose positions are no longer in existence. We have held that this is not necessary. N. L. R. B. v. Lightner Publishing Corp., 128 F.2d 237, 241.

The Board's findings are supported by the evidence and the findings support the order. The petition for enforcement is granted and the enforcement of the Board's order is allowed.