NATIONAL LABOR RELATIONS BOARD.
v. PHŒNIX MUT. LIFE INS. CO.
No. 9493.

Circuit Court of Appeals, Seventh Circuit.
May 7, 1948.

984

MAJOR, Circuit Judge, disenting.

———◇———

David P. Findling, Associate General Counsel, Ruth Weyand, Acting Assistant General Counsel, National Labor Relations Board, Fannie M. Boyls and Frederick D. Vincent, Jr., all of Washington, D. C., for petitioner.

Tom Leeming, Richard V. Henry, Jr., Lewis D. Spencer, and Owen Rall, all of Chicago, Ill., for respondent.

Before MAJOR and MINTON, Circuit Judges, and DUFFY, District Judge.

DUFFY, District Judge.

The National Labor Relations Board petitions this court pursuant to Section 10(e) of the National Labor Relations Act, 49 Stat. 449, Sec. 1 et seq.; 29 U.S.C.A. § 151 et seq., for enforcement of its order of June 6, 1947, based upon findings that the respondent, in discharging employees Davis and Johnson, engaged in unfair labor practices affecting commerce in violation of Section 8(1) of the act. The Board found that respondent had interfered with, restrained, and coerced its employees in their rights guaranteed under Section 7 because they had engaged in concerted activity for their mutual aid or protection. The Board ordered respondent to cease and desist from the unfair labor practice so found and to reinstate Messrs. Davis and Johnson with back pay and to post appropriate notices of compliance.

Section 8(1) of the act provides:

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 * * *."

Section 7 provides:

"Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in * * * concerted activities for the purpose of collective bargaining or other mutual aid or protection."

The issues to be here decided are: (1) Is the National Labor Relations Act applicable to respondent's operations? (2) Were salesmen Davis and Johnson employees of respondent or independent contractors? (3) Is the Board's finding that Davis and Johnson were discharged by respondent because they engaged in concerted activities for their mutual aid or protection supported by substantial evidence, and if so did respondent's actions amount to an unfair labor practice under the act? and (4) Was the Board's order valid and proper?

Respondent, a Connecticut corporation, is a mutual life insurance company whose business is selling and issuing life insurance policies and annuities. On the basis of total insurance in force it ranks 24th among all insurance companies in the United States. It conducts business in 33 States and in the District of Columbia. Of its two branch offices in Chicago, the one known as the Chicago-LaSalle Office is involved in this proceeding. On December 31, 1945, respondent had in force insurance amounting to the total of $814,789,831.00, and its total assets amounted to $386,044,844.00.

■ There can be no doubt as to the act's application to the business of respondent. Polish National Alliance v. National Labor Relations Board, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 464, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board, v. Bradford Dyeing Association. 310 U.S. 318, 326, 60 S.Ct. 918, 84 L.Ed. 1226. A good description of the scope of respondent's business is given in the following quotation from the decision of the Supreme Court in United States v. South-Eastern Underwriters Association et al., 322 U.S. 533, 539, 540, 541, 64 S.Ct. 1162, 1166, 88 L.Ed. 1440:

"The modern insurance business * * * has become one of the largest and most important branches of commerce. * * *

"* * * Premiums collected from policyholders in every part of the United States flow into these companies for investment. As policies become payable, checks and drafts flow back to the many states where the policyholders reside. The result is a continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to negotiation and execution of policy contracts. * * *."

It is apparent that a stoppage of respondent's business at any of its sources would have a substantial effect upon the flow of interstate commerce. Associated Press v. National Labor Relations Board, 301 U.S. 103, 125–130, 57 S.Ct. 650, 81 L.Ed. 953; Polish National Alliance v. National Labor Relations Board, supra, 322 U.S. at pages 646, 647, 64 S.Ct. 1196.

■ The contention made that the particular acts of respondent, upon which the Board based its finding of unfair labor practice, have not been shown to have been a burden upon commerce is without merit. The Board need not prove an actual stoppage in the flow of commerce or even the immediate likelihood of such stoppage before it assumes jurisdiction over the employer. National Labor Relations Board v. Bradford Dyeing Associaton, supra, 310 U. S. at page 326, 60 S.Ct. 918; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 222, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 608, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 43, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

■ The Board here properly concluded:

"The activities of the respondent * * * occurring in connection with the operations of the respondent described * * * have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States, and tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce."

Respondent strongly urges that its salesmen are not employees within the meaning of the act and argues that Davis and Johnson were independent contractors to whom the protection of the act may not properly be extended.

The act does not contain a precise definition of the term "employee." As amended in 1947 by the Taft-Hartley Law, Public Law No. 101, 80th Cong., 1st Sess., Chap. 120, 29 U.S.C.A. § 152(3), the act provides that the term "employee" shall not include "any individual having the status of an independent contractor." Therefore, it was incumbent upon the Board in the first instance to determine whether the insurance salesmen involved were employees or independent contractors, and this court likewise must determine that issue on the Board's petition for enforcement of its order.

A similar question was considered by this court in Williams v. United States, 7 Cir., 126 F.2d 129, 132, certiorari denied, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527, where the rule was stated that each case must depend upon its own facts, and that the test most *usually* employed for determining the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the person for whom the work is done. This court there pointed out that the employer-employee relationship exists when the person for whom the work is done has the right to control and direct the work, not only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished, and that it is the right and not the exercise of control which is the determining element. A number of tests were pointed out, such as the right to hire and discharge persons doing the work, the method and determination of the amount of the payment to the workmen, whether the person doing the work is engaged in an independent business or enterprise, whether he stands to make a profit on the work of those working under him, the question of which party furnishes the tools or materials with which the work is done, and who has control of the premises where the work is done. In addition to the tests there mentioned, consideration must be given to other factors, such as whether the relationship is of a permanent character, the skill required in the particular occupation, and who designates the place where the work is to be performed.

In the case at bar the respondent provides headquarters for its salesmen and furnishes each of them with office space, a desk, a telephone, stenographic service, stationery, postage, filing cabinets, sales supplies, and business cards. It also pays for the indemnity bonds and license fees which the State of Illinois requires of each insurance agent. Each salesman is required to devote his full time to respondent's business and may not assign his contract, nor employ anyone to work under him. Respondent requires each salesman to produce a specified minimum of new business each year and if he fails to do so he is subject to discharge. The salesmen are engaged in soliciting life and endowment insurance within an assigned territory and usually collect the first premium. Respondent selects its agents from among those persons who make written applications for these positions, and after having a personal interview. To be selected as an insurance salesman, it is not necessary for the applicants to have previous experience at selling insurance. After an applicant is selected and after signing an agency contract, each is given an intensive training by respondent's supervisory staff. He spends the first two weeks of his employment in respondent's offices receiving instructions from the office manager and other supervisory personnel, and is taught the use of the company's various forms and records, and initiated in the sales approach. After completing this training period the salesmen are permitted to take field trips. During their first interviews they usually are accompanied by respondent's office manager or other supervisor, but as they gain experience they are subjected to less field supervision. During the first two years of their service they are known as junior salesmen and as such may operate under a financing contract rather than a regular commission contract. Under such a contract the salesman may borrow $100.00 up to as much as $300.00 a month. These loans are in the nature of advances on commissions which the salesman is expected to earn. After they become senior salesmen they no longer are entitled to borrow under a financing contract but receive other benefits or in-

ducements which encourage them to remain permanently with the respondent.

The evidence before the Board discloses that respondent keeps a close check on the details of its salesmen's work and exercises a large measure of control over them. Each salesman must furnish management regularly with an accurate daily record of interviews and sales, must show for each day of the week the number of hours worked in the field, the number of interviews had, the number of new prospects interviewed and many other similar details. Respondent furnishes each salesman with certain sales services, such as circularizing by mail, without cost to the salesman, and supplying the salesman with advertising specialties and miscellaneous material.

It is also persuasive evidence of the salesmen's status as employees that respondent maintains a plan for the retirement and pensioning of its salesmen. This retirement and pension plan is noncontributory, although they do have the privilege of increasing their retirement income through voluntary participation. Respondent has also made available for its salesmen special pensions providing income for total and permanent disability.

Respondent regarded its salesmen as being in a somewhat different class than ordinary insurance salesmen. In its pamphlet, "Selecting Salesmen," it said:

" * * * It (respondent) then decided to take the most forward steps known to Life Insurance. These involved the cancellation of all part-time contracts and the employment thereafter of only representatives who would devote their full business time to the Phœnix. * * * the Phœnix is still the only company on the American continent which employs a small, compact, and exclusively full-time sales representation."

In another pamphlet it referred to the fact that the hiring of salesmen had been put upon a scientific basis.

It is thus apparent from the undisputed facts before the Board that respondent's salesmen, by all applicable recognized standards, fall into the class of employees rather than independent contractors, and we so hold.

In September, 1944, ten salesmen worked under the supervision of respondent's branch manager of the Chicago-LaSalle Office. There was also a clerical and stenographic staff of five persons who worked under the supervision of the cashier of that office. In addition to acting as a service department to the home office and to the public, the cashier's department has the responsibility of serving the salesmen efficiently. Those in the cashier's department work in close cooperation with the insurance salesmen. The cashier's department disburses initial commissions to salesmen and maintains records concerning the applications received and policies issued. When requested it functions to furnish information to salesmen concerning policies, premiums, dividends, conversions, beneficiaries and in general to assist them with information not generally known or published. The degree of efficiency of the cashier and employees in that department often aids or hinders the effectiveness of the work of the insurance salesmen. Inconvenience, embarrassment, added work and loss of sales to prospective customers have, in the past, resulted to salesmen from such incidents as errors which a cashier made in calculating costs to guide the salesmen in dealing with prospective policyholders, the erroneous application of dividends which had accrued to a policyholder, and giving faulty information supplied by a cashier respecting a settlement agreement.

The Board found that the capability and competency of the cashier had a direct connection with and relationship to the working conditions of respondent's salesmen, and substantial evidence supports the Board's finding.

About September 1, 1944, Mr. Herbig, the manager of the Chicago-LaSalle Office, called a meeting of the salesmen and announced the resignation of the cashier, telling them selection of a successor was under consideration by the home office and that the new appointee probably would be transferred from another branch office. The impending change loomed important

to the salesmen by reason of their dependence upon the cashier's department for information and assistance affecting their earnings. During the two weeks after the announcement the salesmen discussed the matter of the cashier's successor at some length.

On the morning of September 11, and again at lunch on that day, the salesmen met and expressed their dissatisfaction with the fact that they had suffered inconvenience and loss of time due to the "breaking in" of four different cashiers during the last few years. The salesmen discussed the advisability of making a recommendation to respondent and all of them agreed that the assistant cashier was well qualified to fill the vacancy, and that they would prefer her to an outsider; but as to whether the salesmen should recommend the appointment of any specific person there was some disagreement. Salesman Davis was designated by the group to write a letter which, if approved and signed by all ten of the salesmen, was to be sent to the home office. Davis, with the assistance of Johnson and Goldberg, prepared a tentative draft of such letter, which was discussed and revised at a subsequent luncheon meeting of the salesmen.

Before the final draft had been agreed upon the manager learned of the proposed letter and questioned salesman Goldberg, who explained that the final draft had not been completed and that he therefore did not know just what the contents would be. The manager thereupon advised him not to sign it.

On September 15, before Davis had an opportunity to put the letter in final form, he and Johnson received notices from the respondent terminating their agency contracts. The letters were almost identical. Each stated:

"Your recent actions and involvement in the resignations and new appointment affecting our Cashier's Department have been so far beyond the premise of your responsibility, and so completely unpleasant that in full agreement with the Home Office we are cancelling your Agent's Contract, effective thirty days from today."

The letters further instructed Davis and Johnson to turn in their supplies and rate books, to have their desks cleaned out, and their agency affairs closed by noon of the following day.

Section 7 of the act provides that "employees shall have the right * * * to engage in * * * concerted activities, for the purpose of collective bargaining or other mutual aid or protection." By incorporating this language, Congress must have intended to include within the act what the usual meaning of these unambiguous words conveys. A proper construction is that the employees shall have the right to engage in concerted activities for their mutual aid or protection even though no union activity be involved, or collective bargaining be contemplated. Here Davis and Johnson and other salesmen were properly concerned with the identity and capability of the new cashier. Conceding they had no authority to appoint a new cashier or even recommend anyone for the appointment, they had a legitimate interest in acting concertedly in making known their views to management without being discharged for that interest. The moderate conduct of Davis and Johnson and the others bore a reasonable relation to conditions of their employment. It was, therefore, an unfair labor practice for respondent to interfere with the exercise of the right of Davis and Johnson and the other salesmen to engage in concerted activities for their mutual aid or protection. The finding of the Board that Davis and Johnson were discharged because they engaged in concerted activities for their mutual aid or protection is supported by substantial evidence on the record as a whole.

The last point for consideration is whether the Board's order is valid and proper. The Board rejected the trial examiner's recommendation that a broad cease and desist order issue, but did order the reinstatement of Davis and Johnson without prejudice to their seniority and other rights and privileges, including retirement benefits. The order also required that the respondent make whole Davis and Johnson

for any loss of earnings they may have suffered by reason of respondent's discrimination against them, commencing from the date when they filed their charges with the Board.

This court has held that to effectuate the policies of the act the Board may, in cases of violations of Sections 8(1) and 8(3), order reinstatement with back pay. National Labor Relations Board v. Vail Mfg. Co., 7 Cir., 158 F.2d 664; National Labor Relations Board v. The Austin Co., 7 Cir., 165 F.2d 592. This principle is not here seriously challenged by respondent, but complaint is made that in determining the loss in earnings the Board considered renewal commissions as deferred compensation for the sale of the policies rather than "earnings" for work performed during the years when the policies are still in force.

The argument has some force that sound insurance practice regards renewal commissions as earnings over the years when the salesman gives the policyholders continued service. It would depend to some extent on the managerial policies of the company and the activities of the agents. In many cases no service whatsoever is rendered by the agent. But from the record before us we are in no position to hold that the board was clearly wrong. In fact, the Board reserved the right to modify the reinstatement and back-pay provisions of its order should such modifications become necessary by reason of a change of conditions in the future. This was within the power of the Board. Phelps-Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 199, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; International Union, etc. v. Eagle-Pitcher Mining & Smelting Co., 325 U.S. 335, 341, 65 S.Ct. 1166, 89 L.Ed. 1649. Because of a possible refusal by Davis and Johnson to accept reinstatement, or because of the difficulties in measuring the amount of renewal commissions, a subsequent order to clarify the application of the present order may be necessary. We hold that the order of the Board is valid and proper.

The petition for enforcement of the order is granted.

MAJOR, Circuit Judge (dissenting).

I would deny enforcement of the Board's order for the reason that the "concerted activities" in which respondent's insurance salesmen engaged, as found by the Board, were not for their "mutual aid or protection," as contemplated by Sec. 7 of the Act. In my judgment, both the stated purpose of the Act and a reasonable interpretation thereof required a holding that it was never contemplated by Congress that such activities should form the basis for an unfair labor practice. It must be remembered that no labor dispute or labor union, or the right to form, join or assist a labor organization, or any right on the part of the salesmen, or refusal on the part of the respondent to bargain collectively, as those terms are defined by the Act and many times construed by the courts, are involved. Neither is there any grievance concerning wages, rates of pay, hours of employment or conditions of work. In fact, the grievance is not only petty but personal and private in its nature.

The grievance concerns the selection by respondent of a cashier, which was wholly the prerogative of management. To put it bluntly, their grievance was directed at a matter which was none of their business or concern. The opinion of the majority on this aspect of the case has the effect of enlarging the jurisdiction of the Board beyond all intendments and penalizes an employer for discharging an employee who busies himself in concert with fellow employees about matters which are none of their concern, all under the guise that it is for their "mutual aid or protection." I would suppose under the holding of the majority that the salesmen would also be protected if they engaged in "concerted activities" regarding respondent's president, its board of directors, its attorneys, the location of its office, or the form and contents of the policies issued by respondent which the salesmen are authorized to sell, this notwithstanding that respondent would be under no obligation to bargain with them concerning these and other matters wholly within the realm of the managerial orbit, all under the pretext that they had a "legitimate interest" in such matters.