314 F.2d 761
 MINNESOTA MILK COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, and Milk Drivers
and Dairy Employees' Union, Local No. 546, International
Brotherhood of Teamsters, Chauffeurs, Warehousemen and
Helpers of America, Intervenor.
 No. 16966.
 United States Court of Appeals Eighth Circuit.
 March 7, 1963.
 
 1
 Thomas M. Vogt, St. Paul, Minn., made argument for petitioner; Felhaber, Larson & Fenlon, St. Paul, Minn., with him on the brief.
 
 
 2
 Hans J. Lehmann, Atty., N.L.R.B., Washington, D.C., made argument for respondent; Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N.L.R.B., Washington, D.C., with him on the brief.
 
 
 3
 Donald Savelkoul, Minneapolis, Minn., made argument for intervenor and filed brief, with Sigal & Cohen, Minneapolis, Minn.
 
 
 4
 Before VOGEL and VAN OOSTERHOUT, Circuit Judges, and VAN PELT, district judge.
 
 
 5
 VAN PELT, District Judge.
 
 
 6
 This case is before us upon a petition to review and modify an order of the National Labor Relations Board in a dispute involving the status of Lyle Hillyer, who distributed petitioner's dairy products on specified routes in suburbs of Minneapolis in June, 1960. It also involves the 1960 labor agreement between the petitioner dairy and the intervenor union. The company's complaint was dismissed in part by the Board. Minnesota Milk Co., 133 N.L.R.B. No. 123, 49 L.R.R.M. 1001.
 
 
 7
 The issues we must decide in order to completely dispose of this case are:
 
 
 8
 1) Was Hillyer an employee of the company or an independent contractor?2) Did the union violate Section 8(e) of the National Labor Relations Act by requiring the petitioner to terminate the relationship which existed between it and Hillyer from June 6th to June 8th?
 
 
 9
 3) Was the Board correct in its finding that Article 6, Section A of the 1960 labor agreement between the dairy and the union is, as applied to the facts of this case, unintelligible as an expression of the intention of the parties and too vague to be susceptible of construction or interpretation under Section 8(e) of the Act? If the provision is not so unintelligible, what is the proper construction to be placed on it?
 
 
 10
 4) Is the provision violative of Section 8(e) of the Act; and was the execution of the contract containing the clause an unfair labor practice?
 
 
 11
 The trial examiner found that Hillyer was an independent contractor. He found that the union's conduct in forcing the dairy to terminate its arrangement with Hillyer was in violation of Section 8(e) of the Act. The examiner further found that Article 6, Section A and Article 15, Sections A and D of the labor agreement were within the purview and violative of Section 8(e) of the Act. There were other findings and conclusions with which we are not here concerned. No claim is made in this court that the findings as to Article 15 were erroneous.
 
 
 12
 The Board, speaking through Messrs. McCullough, Fanning, and Brown, with Messrs. Rodgers and Leedom dissenting, disagreed with the examiner as to Hillyer's status and found that he was an employee. Having so found, it stated:
 
 
 13
 'We cannot sustain the Trial Examiner's findings that Respondent's conduct in forcing the Company to terminate its arrangement with Hillyer was in violation of Section 8(e) of the Act.'
 
 
 14
 The Board further found with respect to Aticle 6, Section A:
 
 
 15
 'We find this section based on the language employed, too vague to be susceptible of construction or interpretation for the purposes of Section 8(e), * * *'
 
 
 16
 later stating:
 
 
 17
 'We have found Article 6, Section A, unintelligible as an expression of the intent of the parties and its implementation in the single instance before us not in violation of 8(e).'
 
 
 18
 The dairy for many years had recognized the union and entered into a series of collective bargaining agreements, including the one involved herein, which was effective from May 1, 1960 through April 30, 1962.
 
 
 19
 Article 6, Section A of the agreement provided:
 
 
 20
 'ARTICLE 6.
 
 
 21
 'SOLICITING-- SALES PROMOTIONS
 
 
 22
 'Section A:
 
 
 23
 It is further agreed that all future retail sales promotions and soliciting of customers shall be done by regular employees of the company or members of Local No. 546. It is agreed that no product shall be sold for resale to peddlers or so-called independent milkmen, unless they have been working in the same capacity for two (2) years or over with the same Distributor; they to pay dues and work under the same conditions as all other employees.'
 
 
 24
 In May, 1960 Lyle Hillyer expressed to the secretary of the dairy a desire to start a milk route. He was then otherwise employed but planned to leave his job. After three or four meetings Hillyer and the petitioner on Saturday, June 4, reached an oral agreement. The dairy was to sell Hillyer milk and other dairy products at spectified prices. Hillyer was to sell the products both at wholesale and retail at prices to be determined by him in the agreed territory, and pay for his products at the end of each week. His compensation would be the difference between the purchase price and the sales price less expenses. In one of the two suburbs assigned to him, another driver, who was a regular employee of the company, had handled the accounts. Petitioner did not have a route in the other suburb prior to Hillyer's beginning work.
 
 
 25
 Hillyer was to lease a truck from petitioner and pay 1cents per unit for its use. A unit was any single item. This lease arrangement was to remain in existence until Hillyer could get his own truck. Petitioner was to supply the gas and oil and Hillyer in turn would be billed for it at the end of the month. Gasoline was obtained at petitioner's garage in St. Paul. Petitioner was to take care of the repairs on the truck. This was included in the 1cents per unit leasing cost. The truck was to bear the name of petitioner. It was to be covered under petitioner's fleet insurance policy and Hillyer was to be billed for the insurance at the end of the month. He used the dairy company's basket which he found in the truck. The dairy company supplied the equipment such as receipt books, sale books and order books and he was to billed for them. According to Hillyer he was to wear a Minnesota Milk uniform. The secretary, with whom he made the agreement, stated that he told him 'we would try to find something he could wear until he could provide something for himself.'
 
 
 26
 There was no agreement as to the number of hours or the number of days per week Hillyer was to work. There was no discussion regarding overtime, vacation pay, pension or health and welfare benefits. It Hillyer desired hospitalization insurance he would have to provide it himself. There was no agreement regarding deductions for Social Security or income tax withholding. It was Hillyer's understanding that he was not to have any of the benefits of the labor agreement. He could return any product that he hadn't sold during the day and he turned in all empties. He collected the unpaid accounts due the dairy from the customers on the one route he took over and was to remit the proceeds to the dairy.
 
 
 27
 Prior to commencing the sale of the dairy products Hillyer obtained a Minnesota wholesale dealers license and posted a bond. He paid these costs. He also obtained and paid for business cards bearing his name. He began his work on June 6. After making his deliveries he solicited new retail accounts in both suburbs; then returned his truck to the petitioner's plant and checked in his empties and made out a credit slip, leaving his truck at petitioner's plant. In the evening he solicited wholesale accounts. He operated the same on June 7th and 8th.
 
 
 28
 On June 8th two officers of the union came to the office of petitioner's president and demanded that Hillyer, to whom they referred as the 'peddler', must come off. The president refused and was told by the union officers that the plant would be picketed the following morning. He asked as to alternatives and was told that the 'peddler' must be put on the payroll. The president agreed and Hillyer was placed on the dairy payroll beginning June 9th. He voluntarily ceased to work as a driver the end of July. Hillyer was a member of the local union in Minneapolis and on July 10th was told that he would have to transfer his membership from the Minneapolis union to the St. Paul union, and that he had to abide by the labor contract with the dairy and if he did anything out of line he would be brought before the executive board and fined heavily.
 
 
 29
 Before beginning a detailed discussion of the issues, we deem it appropriate to set forth out conclusions. We adopt the Board's finding that Hillyer was an employee of the petitioner and not an independent contractor. In view of the well recognized rule that Section 8(e) of the Act does not control relationships between an employer and his employees, we hold that the union's action in requiring the petitioner to terminate the relationship, which existed between it and Hillyer prior to June 9th when he began wirking under the labor agreement, was not violative of Section 8(e).
 
 
 30
 We will treat first the question of Hillyer's status. The Act does not in detail define 'employee.' It does provide in Section 2(3) as amended in 1947 that 'the term 'employee' shall include any employee' but shall not include any 'individual having the status of an independent contractor.'
 
 
 31
 In determining who is an employee we look to federal law rather than to that of Minnesota or any other state. See National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170. It is also evident from that case that Congress in devising the federal legislation with which we are concerned recognized that in some situations the previously established legal classifications of employer and employee shaped by the law for different purposes would not be sufficient in determining who is an 'employee' as the word is used in the Act.
 
 
 32
 Certain other rules seem clear but should be stated. Common law or statutory concepts of employer-employee relationships yield in effectuating the purposes of the Act. National Labor Relations Board v. Gluek Brewing Co., 8 Cir., 144 F.2d 847; National Labor Relations Board v. Hearst Publications, Inc., supra.
 
 
 33
 The tests to be applied have been stated on many occasions and under varying factual situations. A well recognized test is stated in National Labor Relations Board v. Phoenix Mutual Life Ins. Co., 7 Cir., 167 F.2d 983, 6 A.L.R.2d 408, cert. denied 335 U.S. 845, 6 S.Ct. 68, 93 L.Ed. 395. United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 is in accord, and this court in Fruco Construction Co. v. McClelland, 8 Cir., 192 F.2d 241 has given general support to the position taken here. In Phoenix, it was stated:
 
 
 34
 '* * * the test most usually employed for determining the distinction between an independent contractor and an employee is found in the nature and the amount of control reserved by the person for whom the work is done. * * * the employer-employee relationship exists when the person for whom the work is done has the right to control and direct the work, not only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished * * *. A number of tests were pointed out (by the Court in a preceding case), such as the right to hire and discharge persons doing the work, the method and determination of the amount of the payment to the workmen, whether the person doing the work is engaged in an independent business or enterprise, whether he stands to make a profit on the work of those working under him, the question of which party furnishes the tools or materials with which the work is done, and who has control of the premises where the work is done. In addition to the tests there mentioned, consideration must be given to other factors, such as whether the relationship is of a permanent character, the skill required in the particular occupation, and who designates the place where the work is to be performed.' (167 F.2d 986, 6 A.L.R.2d 408)
 
 
 35
 We shall not further cite authority or refer to the tests. As stated in Blount, 8 Cir., 131 F.2d 585, supra, the determination of whether the employer-employee relationship or the independent contractor relationship exists is dependent upon the particular facts as they relate to the inquiry in which the question is raised. Under the tests adopted in this Circuit and approved in Hearst, supra, we conclude that the Board correctly held that 'Hillyer was an employee of the company and not an independent contractor.'
 
 
 36
 Having concluded that this was an employer-employee relationship, it follows that the union's action in forcing the dairy to terminate the oral arrangement of June 4th was not in violation of Section 8(e) of the Act.
 
 
 37
 The entire court is in agreement with the findings of fact and conclusions of law thus far expressed in this opinion. The majority of the court also agree with the finding of the Board that '* * * the language used (in Article 6, Section A) is ambiguous to a degree which prevents a finding as to its legality * * *' and that the clause was '* * * unintelligible as an expression of the intent of the parties. * * *'
 
 
 38
 Therefore, the Board's findings as discussed above are affirmed and we order enforcement of its order.
 
 
 39
 The judge writing the opinion believes that Article 6, Section A is reasonably susceptible of construction and when properly construed did not prevent the employer from dealing with bona fide independent contractors and that, therefore, the execution of the contract containing that provision was not a violation of Section 8(e). Nothing will be gained by elaboration on the reasons for this belief.
 
 
 40
 I do express disagreement with the Board's findings last above quoted.