**UNITED INSURANCE COMPANY OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

Insurance Workers International Union, AFL–CIO, Intervenor.

**INSURANCE WORKERS INTERNATIONAL UNION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

United Insurance Company of America, Intervenor.

Nos. 15266, 15589.

United States Court of Appeals Seventh Circuit.

Dec. 21, 1966.

Almore H. Teschke, Chicago, Ill., Bernard G. Segal, Philadelphia, Pa., Teschke, Burns, Maloney & McGuinn, Chicago, Ill., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Edward B. McGuinn, Chicago, Ill., Irving R. Segal, James J. Leyden, Herbert G. Keene, Jr., Philadelphia, Pa., for petitioner United Ins. Co. of America.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Vivian Asplund, Atty., National Labor Relations Board, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen., Counsel, Glen M. Bendixsen, Atty., N. L. R. B., for respondent.

Isaac N. Groner, Cole & Groner, Washington, D. C., for Insurance Workers International Union, AFL-CIO.

Before KNOCH, CASTLE and SWYGERT, Circuit Judges.

CASTLE, Circuit Judge.

These cases are before the Court upon the petition of United Insurance Company of America (Company) to review and set aside an order of the National Labor Relations Board issued against the Company July 28, 1965, a petition of Insurance Workers International Union, AFL-CIO, (Union) to review the Board's order to the extent the order denied the Union the full relief it requested, and upon the cross-petition of the Board to enforce its order.[1] A motion of the Company to dismiss the Union's petition was taken with the case on the merits.

The Board found that the Company violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended, by its admitted refusal to bargain with the Union, the certified representative of the Company's debit agents in Baltimore City and Anne Arundel County, Maryland.

The Company is engaged primarily in selling industrial life insurance, a form of ordinary life insurance in which the policies are written in amounts of less than $1,000 and the premiums are payable weekly, and for that purpose maintains district offices throughout the country. Each district office has a manager and several assistant managers, and each assistant manager heads a group of four or five debit agents. These debit agents, so-called for the reason that "debit" describes the agent's book listing the policyholders from whom the agent collects premiums, spend most of their time in the collection of premiums from policyholders residing in a given area. They also solicit applications for new insurance and for fire insurance written by another insurer whose business is also handled by the management and supervisors of the Company.

On June 4, 1964, the Union filed a petition with the Board seeking certification as the collective bargaining representative of the Company's debit agents in Baltimore City and Anne Arundel County, Maryland. On March 16, 1964, the Company had entered into a reinsurance agreement with Quaker City Life Insurance Company, a Philadelphia, Pennsylvania corporation, under which, among other things not here pertinent, the Company reinsured the industrial life insurance policies issued by Quaker in a number of states, including those in force in Baltimore City and Anne Arundel County, Maryland. Quaker had chosen to maintain an employer-employee

1. The Union's petition was originally filed in the United States Court of Appeals for the District of Columbia Circuit. The Company thereafter filed its petition with this Court and it was transferred to the District of Columbia Circuit as provided by 28 U.S.C.A. § 2112(a). The Board cross-petitioned for enforcement of its order, and the D.C. Circuit transferred the proceedings to this Court where they were consolidated for hearing and disposition.

relationship with its debit agents, and its agents in Baltimore City and Anne Arundel County were represented by the Union. Upon the effective date of the reinsurance agreement (March 16, 1964) Quaker terminated all of its employees. Some of Quaker's former agents in Baltimore City and Anne Arundel County became agents of the Company. The policies they serviced, and the business they generated, were handled from the Company's Franklin Street district office in Baltimore, a location formerly utilized by Quaker. The debit agents here involved were about equally divided between that office and the company's St. Paul Street district office from which the Company had handled its policies in Baltimore prior to its reinsurance of Quaker's policies and continued to maintain.

On July 6, 1964, the Company and the Union entered into a stipulation for certification upon consent election which by its terms provided that the Company did not waive its contention that the debit agents in the unit were independent contractors and not employees within the meaning of the Act, and that the failure of the Company to contest that issue was limited solely to the representation proceeding. The Union won the election and was certified on August 14, 1964. On August 20, 1964, the Union requested recognition. On September 1, 1964, the Company denied that request. It based its refusal to bargain with the Union on the ground that the debit agents involved are independent contractors and not employees.

The Board ordered the Company to cease and desist from its refusal to bargain, to bargain with the Union upon request, and to post designated notices.

The Board's conclusion that the Company violated Section 8(a) (5) and (1) of the Act is predicated upon the Trial Examiner's findings and conclusions to the effect that the Company's debit agents in the Baltimore City and Anne Arundel County area unit here involved are employees within the meaning of the Act, which findings and conclusions the Board adopted.

The Company contends that the Board's order is not supported by substantial evidence on the record considered as a whole; that the findings and conclusions adopted by the Board are, in material part, the product of subjective conclusions drawn from the trial examiner's personal observations rather than from the evidence; that material comparative testimony, proffered by the Company, was erroneously excluded; and that at the most the testimony of the two witnesses credited and relied upon by the examiner can be regarded as establishing only that the unit was half "employee" and half "independent contractor".

The Union's contentions [2] are limited to its assertions that the Board erred in denying its requests that there be included in the Board's order a specific direction that the Company bargain concerning the fire insurance aspects of the debit agents' activities and a requirement that the Company, from the date of its refusal to bargain until the discharge of its bargaining obligations, apply to all of the debit agents in the unit the terms of a contract which allegedly had existed between Quaker and its former debit agents; and that the Union is entitled to challenge these aspects of the Board's order as a "person aggrieved". The Company's motion to dismiss the Union's petition in No. 15589 challenged the Union's status as an aggrieved person. The Board takes the position that while the Union is an aggrieved person in so far as jurisdictional purposes are concerned, and therefore this Court has jurisdiction of the Union's petition for review, the contentions of the Union with respect to the scope of the Board's order are wholly without merit.[3]

2. Except for those contentions urged by the Union as intervenor in No. 15266 in support of the Board's order.

3. In view of our conclusion that the Board's order is not entitled to enforcement the Union's petition in No. 15589, and the Company's motion to dismiss that petition, are moot. Accordingly, we will not discuss the contentions of the parties with respect thereto. Suffice it to indi-

Two years prior to the Union's petition for certification in the instant matter the issue whether the Company's debit agents in Pennsylvania were Company employees or independent contractors was before this Court in United Insurance Company of America v. N. L. R. B., 7 Cir., 304 F.2d 86. This Court there observed:

"In the instant case, United has chosen to operate its business on the basis that its agents are independent contractors and, of course, it had the complete legal right so to do."

And citing N. L. R. B. v. Phoenix Mutual Life Insurance Company, 7 Cir., 167 F. 2d 983, 6 A.L.R.2d 408, and National Van Lines, Inc. v. N. L. R. B., 7 Cir., 273 F.2d 402, the Court pointed out (304 F. 2d 89):

"* * * that the employer-employee relationship exists when the person for whom the work is done has the right to control and direct the work, not only as to the result accomplished by the work, but also as to the details and means by which that result is accomplished, and that it is the right and not the exercise of control which is the determining element. * * * the critical distinction between employees and independent contractors under the Act is the right to control the manner and means by which the agent conducts his business. In determining whether the requisite control of manner or means is present, various tests have been employed."

but

"The conclusion must be based on the 'total situation' looking at all of the facts in the particular case".

The Court held (304 F.2d 90):

"* * * the debit agents are independent contractors. A debit agent is 'on his own.' He sets his own hours of work and work days and makes his own arrangements with policy holders respecting frequency of premium payments. As admitted by the trial examiner, the agent pays his own travel expense, rent, postage, telephone, bond expense and salaries of assistants; he may take holidays when he desires without notice to United. Agents may transfer policies among themselves and are not required to do so by United. An agent retains his own commission from collected premiums. As to selling insurance, the agent ' * * * is free to follow the superintendent's suggestion or to devise his own methods.' "

The Court rejected as insignificant the factors relied upon by the Board in support of its conclusion that the agents were employees, and in this connection the Court observed:

"Suffice it to say, we have carefully considered each of the items and categories mentioned, but we are convinced they do not show, in connection with all the other facts and circumstances, that an employer-employee relationship existed.

There are many businesses, and the sale of insurance is one of them, where management may make a choice as to the manner in which the business will be conducted. Very often, perhaps traditionally, insurance has been sold through insurance salesmen whose 'tools' are their own initiative and personality and who work on their own time and at their own expense. However, some insurance companies have

cate that we agree with Board's position that the Union was entitled to petition for review of the Board's order insofar as it denied the additional relief the Union requested but that there is no merit to the Union's complaints. There was no necessity for a specific reference to the fire insurance activities. Bargaining orders need not specify each individual matter upon which an employer must bargain, particularly where, as here, the threshold question is whether there is an obligation to bargain. Cf. San Antonio Machine & Supply Corp. v. N. L. R. B., 5 Cir., 363 F.2d 633, 642. And, there is no basis in the record, either factually or legally, to support the Union's request concerning interim application of an alleged contract.

established an employer-employee relationship such as the company in N. L. R. B. v. Phoenix Mutual Life Insurance Company, [167 F.2d 983] supra."

■ With the critical test firmly established by United Insurance Company of America v. N. L. R. B., 7 Cir., 304 F.2d 86, and the decisions cited therein, and the nature of the various factors which may properly be considered in applying that test illustrated by that decision, we turn to an appraisal of the record before us giving full recognition to the fact that the issue presented is to be determined on the record *in this particular case*. National Van Lines, Inc. v. N. L. R. B., 7 Cir., 273 F.2d 402, 407.

■ Under the principles governing our review of the factual findings of the trial examiner, adopted by the Board, those findings are to be accepted if supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. But this formula for judicial review of the Board's administrative action was recognized in Universal Camera (340 U.S. p. 489, 71 S.Ct. 456, 465) as affording "[s]ome scope for judicial discretion" and approved with the express realization that "[t]here are no talismanic words that can avoid the process of judgment", and the admonitions (340 U.S. pp. 488 and 496, 71 S.Ct. pp. 464 and 469) that "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight" and that the examiner's findings are not to be "given more weight than in reason and in the light of judicial experience they deserve" and "are to be considered along with the consistency and inherent probability of testimony". And Universal Camera makes it clear (p. 488, 71 S.Ct. p. 465) that:

"[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

And in this connection Eastern Greyhound Lines v. N. L. R. B., 6 Cir., 337 F.2d 84, reiterates the pertinent observation made in N. L. R. B. v. Elias Bros. Big Boy, Inc., 6 Cir., 327 F.2d 421, 426, after a review of the relevant cases, that:

"In a proper case [the reviewing court] may decline to follow the action of an examiner in crediting and discrediting testimony, even though the Board has adopted the Examiner's findings."

Similarly, in Portable Electric Tools, Inc. v. N. L. R. B., 7 Cir., 309 F.2d 423, 426, this Court had occasion to state:

"While recognizing that the question of credibility is for the trial examiner, an Appeals Court is not precluded from independently determining what weight certain testimony which he finds credible should be given when evaluating the evidence on the record as a whole."

and that if the Court is not to be "merely the judicial echo of the Board's conclusion" a Board determination must be set aside when the record clearly precludes that determination from being justified by a fair estimate of the worth of the testimony of witnesses or the Board's informed judgment on matters within its special competence or both.

The trial examiner's decision discusses testimony and exhibits of record bearing on various factors relevant to, and to which the examiner attached significance in, the determination of the debit agents' status as employees or independent contractors. These factors embrace most of those mentioned in our opinion in the earlier case involving the Company's Pennsylvania debit agents (United Insurance Company of America v. N. L. R. B., 7 Cir., 304 F.2d 86). But, on the record in the instant proceeding, the examiner, although professing that he was not overlooking the Company's testimony that in order to meet or avoid the Board's earlier findings (set aside in United Insurance, supra) it had advertently set

about to and had made changes, including revisions in the manual the Company furnishes its debit agents, to more clearly reflect the independent contractor status; and while finding that the Company does not fix the agent's hours for debit collections and other services on his debit, and that the agent is permitted to retain his commission from the premiums collected, proceeded to find that the testimony concerning certain of the Company's requirements and practices evidenced such right of control as dictated a conclusion that the agents are employees.

In this latter connection the examiner found that (1) the agent is required to make a weekly report and settlement of account at his district office in the morning of a designated day, use forms specified and furnished by the Company, and comply with its accounting procedures; (2) on the day he so reports there usually is a sales meeting with the district manager which the agent is required to attend, followed by group and individual meetings and discussions between the agents and the assistant manager to whom each agent is assigned; (3) the agent receives assistance from and is subject to supervision by the assistant manager to whom he is assigned; (4) transfers of policyholders between agents are subject to Company approval; and (5) the Company pays travel expense, provides rent, postage, and telephone, as well as office space in its district office for the agent's use when he comes in to make his weekly report and accounting, and to pick up mail and telephone messages.

We find no support in the record for some of these findings and but tenuous support for others. Those which are supported by substantial evidence are, in our opinion, consistent with an independent contractor status. They are not indicative of an existence or exercise of control directed to the "manner and means" by which the result to be produced by the agent is to be accomplished, but only of the application of those financial controls, accounting procedures, and business methods and practices which would appear to be normal to the operation of the premium collection phase of the Company's business whether it be carried on through debit agents who are employees or who are independent contractors.

■ There is lack of evidentiary support for the examiner's findings that the Company pays travel expenses and furnishes rent, postage and telephone. In this respect the record merely discloses that where the policyholders making up an agent's debit are dispersed over a large area his commission is 1% more than the normal rate. There is no payment of the agent's actual travel expenses. The record does not establish that the Company furnishes or reimburses the agent for postage. It shows only that if a policyholder mails a premium to the district office together with his premium receipt book the Company mails the book back to the policyholder at its own expense. With respect to "rent", "telephone" and the furnishing of "office space" the record divulges only that during the three or four hours a week the agent spends in the district office of the Company, usually on the morning when he makes his weekly report and accounting, tables and chairs are made available in the district office which the agent may use while preparing his report. Likewise, the agent may occasionally use the Company telephone while he is in the district office or receive a telephoned message which has been left for him.

■ There is testimony that where a policyholder moves from the area serviced by the debit agent or the agent secures a new policyholder outside of the area normally serviced by him [4] he may arrange, subject to Company approval, with the agent who does serve the area involved for a transfer of the policyholder to the latter. There is other testimony that transfers are freely made between agents without first securing Com-

---

4. Each agent has a state-wide license to solicit insurance and is not restricted by the Company in obtaining new business.

pany approval. In any event, it is our opinion that this transfer of business factor is not of critical significance. Both from the standpoint of the extent of the area in which an agent is to have responsibility for premium collections, and for the purpose of financial accounting with the agent, Company concern with such transfers and its need for knowledge of the same is readily apparent.

There is testimony, some of which is not harmonious, concerning the "assistance" furnished and "supervision" exercised by the Company assistant managers, each of whom is assigned a group of four or five debit agents. Thus, while it appears that the assistant manager's association with the debit agent continues after the agent's initial training period, and the assistant manager may determine if and when he elects to accompany the agent on his rounds in the servicing of his debit, there is also testimony that the primary purpose for so doing is to assist the agent in the conservation of business—the calling on policyholders in connection with lapsed policies—and aiding the agent in procuring new business on which the latter receives the commissions. The assistant manager reviews the agent's reports, requires him to make necessary changes if the accounting is not correct, and cautions the agent about poor production when necessary. During periods of an agent's absence from his debit for a week or more because of illness, or while taking a vacation, the assistant manager, if available, will take over for the agent. Thus, while the assistant manager assists the agent and "supervises" the agent in the latter's relationship with and accounting to the Company it is hardly a supervision which entails the control of the "manner and means" as distinguished from the results

the agent is required to obtain. The Company is entitled to insist that the debit be adequately serviced and that a proper accounting of premiums collected be made whether such servicing and collection is carried on through employees or independent contractors. Inadequate results or failure in monetary remittance to the Company would in the absence of corrective action require termination of the relationship in either case.

The testimony concerning attendance of sales meetings and with respect to discussion conferences with the assistant manager on the occasions of the weekly reports to the district office if appraised as evidencing Company insistence upon such attendance is, nevertheless, equivocal. The continuity of the relationship involved and the mutual interest of the parties in the result to be obtained make it imperative that the agents be kept informed with respect to changes in the insurance contracts the Company offers and desirable that they be made aware of incentive programs sponsored by the Company to stimulate sales efforts.

The trial examiner's appraisal of the testimony upon which his findings relating to the above factors were predicated was made on the basis of a credibility resolution that the General Counsel's chief witness, Ronney E. Scott, a former employee-debit agent of Quaker and the chairman of the Union's local, whose display of "evident partisanship" was recognized, "was a reliable witness" and "I credit his testimony generally" as contrasted to what the examiner characterized as "the patently unreliable aspects" displayed by the Company's witnesses.[5]

And the appraisal of the testimony so made by the trial examiner, and the resulting findings he made from the testi-

5. The General Counsel presented the testimony of two witnesses, Scott and Don Ramon Jenkins, both of whom were members of the Union and had been employee-debit agents of Quaker before becoming agents for the Company. Jenkins' comparatively abbreviated testimony supported that of Scott in some particulars. The Company presented the testimony of four of the debit agents, and it was stipulated that the testimony of six others, identified for the record, would be of the same general tenor as that of the four who testified. Additional Company witnesses included its vice-president and general counsel, its agency vice-president, and the district manager, who was formerly a Quaker manager.

mony he credited, were accompanied by and made in the context of his observation that:

"To the extent if any that I may rely on demeanor in the hearing room, I would now report that without exception the agents did not display or appear to have attributes of independence (not even when the 'ringleader' appeared to assert himself as he testified), but acted and appeared to be regarded as rank-and-file employees, not of high rank either in fact or in regard."

and of his reasoning, set forth in a footnote, that:

" * * * there appears to be no good reason for excluding demeanor in the courtroom when the witness is not on the stand and where it is clearly observable as in this case; * * * Without attempting to detail the basis for this necessarily subjective finding, and allowing for an independent contractor's possible concern over renewal or termination of his contract, I can here declare that I observed a uniform and marked deference by agents toward supervisors and company officials which, without obsequiousness but beyond the sometimes elusive requirements of courtesy, is decently characteristic of common attitudes between employees and supervisors; and which in such uniformity differs from the normally observable attitudes between independent contracting parties."

■ A witness' demeanor as a criterion of credibility is generally related to a witness' manner while on the stand or manner of testifying. And although the off-the-stand appearance or conduct of the witness may properly be considered in determining his credibility when it constitutes an observable physical fact, the off-the-stand demeanor here relied upon by the examiner was not based on his observation of a simple physical fact but was predicated upon such subtle manifestations of human reactions as "obsequiousness" and "courtesy" to

which the examiner applied his own view or predilection as to what attitudes are "characteristic" of relationships between employers and employees and between independent contracting parties. In our opinion resort to conclusions drawn from the application of such an elusive subjective standard as the examiner here puts forth is improper and that conclusions so drawn do not afford an acceptable basis for a credibility appraisal much less can they supply any independent evidentiary content. Kovacs v. Szentes, 130 Conn. 229, 33 A.2d 124.

■ In adopting the trial examiner's findings, conclusions, and recommendations the Board specifically disavows reliance upon the demeanor "observation" made by the examiner. But we do not perceive how this disavowal can serve to remove from the examiner's findings and conclusions the flavor with which his demeanor observation tainted them. Cf. Wheeler v. N. L. R. B., 114 U.S.App.D.C. 255, 314 F.2d 260, 263; N. L. R. B. v. American Federation of Television and Radio Artists, 6 Cir., 285 F.2d 902, 903. Our study of the record leaves us with a distinct impression that the flavor of the demeanor observation and accompanying rationalization not only pervades the examiner's credibility resolutions, and thus taints the findings and conclusions resulting from the testimony so credited, but also that independent evidentiary content and force may well have been given, albeit undesignedly, to the "employee attitude" the examiner so tenuously surmised was reflected by debit agents' off-the-stand demeanor.

Thus, in addition to the infirmity of some of the critical findings from the standpoint of lack of substantial evidentiary support, and the insignificant or equivocal nature of the factors embraced in other findings, we are confronted with a record which, when viewed in the light consideration in its entirety furnishes, is revealed to be tainted with a flavor which precludes us from conscientiously relying upon it as adequately supporting the Board's determination and order. There is too much which detracts from the

weight of the evidence relied upon to support the findings and conclusions.

The Company's petition to set aside the Board's order is granted, and, consequently, the Board's petition for enforcement of its order is denied.

Order set aside and enforcement denied.