**Manouchehr and Lila M. AZAD, Plaintiffs,**

**v.**

**UNITED STATES of America,
Defendant.**

**No. 3–65–Civ. 359.**

United States District Court
D. Minnesota,
Third Division.

Aug. 12, 1966.

Lee N. Johnson, Minneapolis, Minn., for plaintiffs.

John G. Milano, Tax Division Dept. of Justice, Washington, D. C., for defendant.

LARSON, District Judge.

### FINDINGS OF FACT

1. The plaintiffs are Manouchehr and Lila Azad, husband and wife. Lila M. Azad is a party to the action only because of the filing of joint tax returns for the years in question. The right to recovery relates to the claim of plaintiff Manouchehr Azad, and he will be referred to as plaintiff or taxpayer.

2. The taxable years in question are the calendar years 1961 and 1962. Plaintiff filed timely returns for those years, was assessed deficiencies, paid the deficiencies, and filed timely claims for refund. The claims for refund were disallowed, and plaintiff sues in this Court to recover $3,883.27 for the year 1961 and $3,557.10 for the year 1962, plus interest.

3. Plaintiff is a physician and surgeon licensed to practice in the State of Minnesota. He completed his residency in radiology at the University of Minnesota in the year 1955. He became a member of the radiology staff of Swedish Hospital on July 1, 1955, and performed both diagnostic and therapeutic services.

4. Swedish Hospital operates extensive hospital facilities in the City of Minneapolis. The Hospital is a qualified tax exempt charitable organization.

5. Section 403 of the 1954 Internal Revenue Code provides in relevant part that where an annuity contract is purchased by a qualified organization by an employer for an employee, that the amounts contributed by such employer for such annuity contract shall be excluded from the gross income of the employee. Certain limiting provisions are not in issue here and the taxability of the annuity payments when received on maturity of the policy or otherwise is not in issue.

6. Prior to July 1, 1955, Dr. L. G. Idstrom, the senior member of the Department of Radiology of the Hospital, hired the plaintiff and on July 15, 1955, advised the Superintendent that after discussion within the Department that the plaintiff would be accepted as a member of the radiology staff effective July 1, 1955, at a salary of $1,000 per month. Plaintiff did not meet the Superintendent of the Hospital until several months later. The plaintiff was told by Dr. Idstrom that he would receive gradual increases in compensation. There was no written contract of employment either with the Hospital or the Department. Plaintiff did not know on July 1, 1955, that he was a member of a partnership, and he did not know the compensation of the other radiologists. He knew that Dr. Idstrom was the head of the Department, and he was told by Dr. Idstrom that he (Dr. Idstrom) could hire plaintiff with the approval of the Superintendent and the Board of Trustees. On one occasion he was told by Dr. Idstrom that he would become a partner as soon as he (Dr. Idstrom) could "make it work."

7. Plaintiff knew that he was subject to annual appointment, and he knew that he was subject to the same regulations as other members of the medical staff. Dr. Idstrom exercised no professional supervision over him and plaintiff testified that no one on the Hospital staff could control or supervise his work, and that he received no written instructions from the Hospital. Dr. Idstrom had the responsibility, however, for seeing that the patients received radiology service. The Hospital did not withhold tax even though the first Treasury ruling specifically directed that the Hospital do so; plaintiff did not ask the Hospital to withhold tax. Plaintiff did not know whether the Hospital contributed to social security, and he did not inquire. Plaintiff was aware of the idea of fringe benefits and had none. Plaintiff's work at the Hospital was on a complicated referral basis from other doctors. He rarely accepted patients directly.

8. As part of the initial arrangement between the Hospital and Dr. Idstrom and the taxpayer, the taxpayer was permitted to work at the University of Minnesota Hospital; the taxpayer performed this work from 1955 to probably 1959 and he regarded this work as charity, education and learning, and received no compensation for it. The evidence does not indicate when this service was terminated. Plaintiff received no compensation for this service. In the years 1961 and 1962 plaintiff performed services at a Hospital in Onamia, Minnesota, which he visited one afternoon in every two week period. In connection with his work at the Onamia Hospital plaintiff did some work at home, and for this

purpose plaintiff purchased two view boxes for use at his home. He also performed teaching service at the Veterans Administration Hospital four to six times per month. Plaintiff's income from these two sources was about $5,000 in 1961 and about $6,000 in 1962. Plaintiff also received and reported miscellaneous fees of about $490 in each of the two years. Plaintiff had no office facilities other than those provided in the hospitals.

9. By the end of 1956 plaintiff received a salary of $15,000 per year. On March 10, 1959, the Board of Trustees voted to increase the salary of plaintiff to $18,000 per year and to authorize drawing accounts for advances on commissions on an annual basis of $23,000 for the three other radiologists in the Department, the actual commissions to be computed on the basis of 40% of the adjusted net income of the Department. The adjusted net income of the Department was determined by a formula which was stated by the Hospital Administrator to be fictitious or arbitrary; the formula allowed for a deduction for depreciation, credit losses, and administration of 5% of the departmental gross income which in the year 1961 amounted to $23,477.93; in recent years (prior to 1966) the 5% figure did not equal the cost of replacement. The Trustees also voted that an administrative fee of $3,000 per year be paid to Dr. Idstrom to cover the management of the Radiology Department, this cost, however, to be included in the regular operating expenses of the Department.

10. On January 10, 1961, at a meeting of the Trustees, the Trustees reviewed the arrangement with the radiologists. The Trustees voted to set the compensation of plaintiff at $23,000 per year and that the arrangement providing for commissions to the other three radiologists remain at 40% of the adjusted net income of the Department.

11. In 1961 plaintiff received his first share of the profits. Plaintiff knew that his drawing account for 1961 was set at $23,000. His total income from his work at the Hospital for that year was about $32,000.

12. The records of the Hospital relating to the determination of Radiology Department Commissions for the years ending 1957 and 1958 indicate no specific reference to a payment to plaintiff and the payment of no commissions to him. In each year the total commissions earned were divided on apparently some prearranged basis to the other three radiologists in the Department. The record for 1959 refers to a payment of $18,000 to plaintiff, but the item is not included in the item described as salaries and payroll charges. In 1959 the commissions were divided among the other three radiologists on an equal basis. The record for 1960 refers to a payment of $18,000 to plaintiff, but the item is not included in the item described as salaries. The record for 1960 refers to a further allocation of commissions to plaintiff in the amount of $9,130.12, the total payment to plaintiff being less than the payments to the other three radiologists. One 1961 record (Plaintiff's Exhibit # 19) indicates total commissions paid and owing to plaintiff of $29,334.51 and a division of commissions to the other three radiologists in equal and greater amounts. There is no reference on this record to annuity payments. A second 1961 record (Swanson deposition—Defendant's Exhibit C) under the item expenses and further under supplies and expense includes $18,000 for plaintiff as part of this item of expense. The record has a separate item for salaries. The second record shows an equal division of commissions among the four radiologists. The 1962 record refers specifically to a salary for plaintiff in the amount of $18,000 not included as payroll or direct expense, but subtracted before determination of commissions due. This record lists annuity premiums paid and indicates an equal division of commissions and earnings for the year among the four radiologists. The 1963 record refers to a "drawing" of $18,000 for plaintiff but reflects equal commissions for the four radiologists. The

1964 record indicates a "draw" of $12,000 for plaintiff included under direct expenses but not as part of payroll and reflects an equal division of commissions earned among plaintiff and two of the other three radiologists.

13. An unsigned memorandum of agreement effective January 1, 1957, provided that the doctors (plaintiff not named) were to serve the Hospital as radiologists, and that they would devote their time, attention and best efforts to their duties and to the best interests of the patients, the attending physicians and the Hospital. The doctors were limited to two months vacation for Dr. Idstrom and one month to the other doctors, but the doctors were to arrange their own vacation schedule. Commissions were to be divided among three doctors (plaintiff not included). If any doctor could not fulfill his part of the agreement because of illness or other cause, the Hospital had the sole right to determine the remuneration to be paid. The setting of charges to patients, the employment of personnel, the setting of salary rates, etc., were to be discussed with and approved by the Hospital Administrator. Medical activities of each doctor were to be approved by Dr. Idstrom.

13-a. An unsigned memorandum of agreement effective January 1, 1961, is substantially the same as the previous memorandum, except that it states that the Hospital will pay each of the four doctors $23,000, but $18,000 of the $23,000 payable to plaintiff shall be charged to X-ray Department expense before computation of net income for commission purposes.

13-b. Plaintiff testified that he never agreed to either memorandum of agreement.

14. On December 16, 1960, plaintiff requested that under the compensation arrangement entered into in July of 1955 that his cash compensation be reduced by $4,000 per year beginning January 1, 1961, and that this amount be applied to the payment of annuity premium.

15. On December 23, 1960, plaintiff and Drs. Rholl and Kasper in a letter to the Commissioner of Internal Revenue described their contractual relationship with the Hospital as follows:

"As Radiologists at the Swedish Hospital, Minneapolis, Minnesota, we are seeking a ruling on whether we are eligible for Tax-Deferred annuities under Section 501(c) (3) of the Code.

"We each devote the majority of out (sic) time in the practice of our specialty in the hospital. Our contractual relationships with the hospital are similar and fairly simple. The essential features of the contracts will be enumerated in the following paragraph.

"The hospital furnishes and maintains all equipment and furnishes all supplies used in the department. The hospital hires and discharges with the recommendation of the Radiologists all personell (sic) in the department. All salaries are paid by the hospital. The hospital exercises no direct control on how the professional services of the department shall be accomplished, except that the quality of the professional services shall be in conformity with the high standards of medical practice in the community and these services are subject to supervision by the medical staff of the hospital. The number of hours that we work daily is at our own discretion with no set working hours established by the hospital. We establish our own routines but preference is given to the hospital work. We are required to comply with the rules and regulations and bylaws of the hospital. A monthly report of our work is required. This report consists of the number of tests and examinations done in the department. Fees to be charged are arrived at jointly by the Radiologists and the hospital administration. The charges for all work done in the department are sent to the business office daily. The hospital collects all fees for services rendered by the department. The monetary com-

pensation can be described as a percentage of net arrangement with each of us paid equally and individually. At the end of each month a specified amount is paid to each Radiologist which is less than the agreed percentage. The difference is carried forward to the end of the year at which time the unpaid amount based on the predetermined percentage of net is paid to each Radiologist in a lump sum. The contracts are for services only, and are terminated for inability to perform. The contracts may be terminated by either the hospital or the Radiologist upon written notice.

"We believe the above listed elements are sufficient to evaluate whether we are eligible for a tax-deferred annuity."

16. On April 5, 1961, the Hospital in a letter to the Treasury Department described the arrangement with the doctors as follows:

"In a letter dated March 13, 1961, you requested information relative to the following doctors who perform services in Swedish Hospital as radiologists: Doctors Manouchero (sic) Azad, Arnold, O. Rholl and Robert E. Kasper. Your letter was received in my office the day after I left for a two week vacation which accounts for the delay in my reply.

"I shall answer your questions in the order in which they appear in your letter.

1. These doctors are not under any written, signed contract with the hospital.

2. The radiology department is located in and is operated as an integral part of our hospital, which owns all equipment and facilities. There is no charge for their use. The radiologists do not furnish any equipment or facilities.

3. None of these radiologists is designated as head of the Department of Radiology and they are not under the supervision of a head of Radiology or any other department.

They are answerable to the Board of Trustees of the hospital for the satisfactory performance of their services.

4. (a) Dr. Azad has performed services for our hospital from July 1955, Dr. Kasper from January 1956 and Dr. Rholl from April 1956.

(b) The nature of the responsibilities of these doctors is that of a doctor to patient, limited to the field of radiology.

(c) There are no differences in their types of services or responsibilities except as it pertains to diagnosis or therapy.

(d) Practically all of their working time is devoted to services in our hospital.

5. We do not require the radiologists to observe regular working hours; to follow an established routine; or to give notice or obtain permission for any absence from work. In case of absence from work the doctors cover for one another.

6. We have no instructions to our radiologists and they make no reports to the hospital, except, of course, the reports they make on their findings in connection with each patient which are incorporated in the medical case record of the patient.

7. The radiologists are not required to comply with any set policies, rules or regulations of the hospital, except as they apply to all members of the medical staff.

8. The radiologists of our hospital receive their remuneration as a percentage of the net income resulting from the operation of the department for each calendar year. Net income is determined by deducting from the gross earnings, all expenses of operating the department, excluding the cost of new equipment and replacements of equipment, and including as an additional expense and deduction an amount equal to 5% of the gross earnings of the depart-

ment to cover costs of administration, depreciation, credit losses and other indirect expenses. 40% of the resulting balance is distributed to the radiologists at the end of each year's business, in amounts mutually agreed to between them. Monthly advances are made to the doctors against the annual computation.

The expenses of the radiologists in attending conventions or other meetings are paid by them.

The hospital bills patients and collects fees for radiological services rendered.

9. Vacations and sick pay are arranged between the doctors involved, who cover for one another. There is no pension plan provided by the hospital.

10. I am not sure what is meant by "helpers." X-ray technicians and office help are employed by the hospital, but are actually hired and supervised by the radiologists who also have the right to discharge them.

11. The services of each of the radiologists would be subject to termination by the Board of Trustees for unprofessional conduct or inability to perform services satisfactorily. Each of them may terminate his services at any time.

12. We have not at any time withheld F.I.C.A. taxes or income taxes from any of the radiologists.

13. We have not and do not consider these radiologists to be employees of our hospital. This position has been supported by court action in connection with malpractice liability."

16–a. The Commissioner of Internal Revenue, Washington, D. C., in answer to the letter set forth in Finding No. 15 and in reliance upon the answers to the questions given by the Hospital set forth in Finding No. 16, ruled under date of May 16, 1961, that plaintiff was an employee of the Hospital, and, further, by separate letter specifically ruled that the Hospital withhold income taxes from the plaintiff's compensation.

16–b. On March 18, 1963, the District Director of Internal Revenue for Minnesota by letter notified the Hospital that an increase in proposed Social Security taxes should be paid by the Hospital on behalf of the plaintiff and the other radiologists. The letter requested the submission of a statement of position by the Hospital and stated that in discussions prior to the date of the letter (March 18, 1963) the Hospital did not agree with the proposed increase in Social Security taxes.

16–c. Subsequent to March 18, 1963, at the request of the District Director of Internal Revenue and the Commissioner of Internal Revenue, the Hospital resubmitted a statement of its position with regard to the employment status of the radiologists. Acting upon such resubmitted materials, the Commissioner of Internal Revenue revoked its earlier ruling to the effect that plaintiff was an employee of the Hospital.

17. On December 22, 1960, the Hospital applied to Northwestern Mutual Life Insurance Co. for a policy providing for Retirement Life Income for plaintiff. Plaintiff also executed the application as the insured. The application stated that the premiums were payable by "501 (c) (3) Employer." The application stated plaintiff's occupation to be radiologist, his industry Hospital, and length of employment of $5\frac{1}{2}$ years. The effective date of this policy was January 15, 1961.

18. On October 10, 1961, the Hospital applied for a second policy. The application is the same as the first except under "Relationship to insured" there is added "501(c) (3) Employer" and the length of employment is stated to be six years. The policy date is also October 10, 1961.

19. The Department of Radiology (listing the four Doctors' names) used a letterhead with the Hospital seal and the name The Swedish Hospital in larger print and the address and telephone number of the Hospital.

20. Bills for services sent to patients by the Hospital carried in the lower right corner the notation "Radiology professional consultation fees are included in the items on this statement. The hospital acts as the physicians' collecting agent. Consultants * * * Radiology" (individual names of the four Doctors).

21. The Hospital paid to Northwestern Mutual Life Insurance Co. annuity premiums on the two policies for the years 1961, 1962 and 1963.

22. The classified section of the Minneapolis Telephone Directory did not prior to 1963 list plaintiff's name under Physicians and Surgeons. The May, 1963 Directory (two and one-half month deadline) did list plaintiff under this heading with the Hospital address and telephone number. There was no evidence as to who paid for the listing. Plaintiff testified that he did not apply for the listing and was not aware of it until the end of 1964 when this was called to his attention by an Internal Revenue Agent. He did not testify that he at any time demanded the removal of the listing.

23. In his 1961 and 1962 income tax returns plaintiff did not include the income from Swedish Hospital, Onamia Hospital, Veterans Administration or miscellaneous fees as wages or salaries, but as professional income. His income tax was paid pursuant to a declaration of estimated tax.

24. In each of the taxable years plaintiff took as a deduction the cost of malpractice insurance. This insurance was taken out by the radiologists as a group who paid the premium. The Hospital did not pay the cost of malpractice insurance for plaintiff, and the Hospital carried no general liability or malpractice insurance for the radiologists.

25. There was no evidence that the doctors composing the Department of Radiology filed partnership tax returns.

26. The Hospital furnished all of the equipment for the Radiology Department, the total cost or value of all of the equipment being from $500,000 to $750,000.

The Hospital decided that the vacation for plaintiff should not exceed one month per year. The Hospital participated in determining the radiology fee schedule. The Hospital participated in the selection of technicians and other employees in the Radiology Department, but these employees were under the direct supervision and control of the radiologists. The Hospital had the right to determine what radiologist or other doctor would be permitted to work in the Hospital. The Hospital could ask a radiologist or any other doctor to terminate his connection with the Hospital if his work was not satisfactory. The Hospital billed the patients, collected the fees, and accounted to the radiologists for the income and expenses of the Department of Radiology operations.

27. The Hospital has consistently taken the position that the radiologists were not employees of the Hospital. The Hospital did not withhold income taxes. The Hospital did not provide any other fringe benefits which normally accrue to employees.

28. Plaintiff is a professional person. He determined the means and methods of performing his work and he determined the end result. The Hospital exercised no control or supervision of the work of plaintiff except that if plaintiff's work was unsatisfactory the Hospital would not permit plaintiff to continue on the staff. As plaintiff testified, no one on the Hospital staff could control or supervise his work. Plaintiff was not required to work certain hours, though like all doctors on the staff he was required to check in and out. Plaintiff was hired by Dr. Idstrom who appears to have determined perhaps in consultation with the other radiologists what share of the income plaintiff would receive. Plaintiff could take his vacation at any time, though the schedule would have to be worked out with the other radiologists. Plaintiff performed services at other hospitals, including Onamia, Veterans Administration, and University of Minnesota. Plaintiff was not restricted by the Hospital to services only for

that Hospital. The referrals to plaintiff came from other doctors and not from the Hospital. The income received by plaintiff was received from the public and not from the Hospital, though the latter acted as collecting agent. On the bills of the Hospital sent to patients the radiologists were described as consultants. The Hospital in its insurance coverage did not include malpractice coverage for the radiologists.

## CONCLUSIONS OF LAW

■ 1. Plaintiff was not an employee of the Hospital in the years 1961 and 1962, and the latter was not the employer of the plaintiff in the years 1961 and 1962.

2. Plaintiff is not entitled to the benefits of Section 403(b) (1) of the Internal Revenue Code of 1954.

## ORDER FOR JUDGMENT

Judgment will be entered for defendant.

## MEMORANDUM

■■ The single issue presented is whether the taxpayer in the calendar years 1961 and 1962 was an employee of Swedish Hospital. The common law tests are to be applied. The single most important test has been held to be the right to control the details of the work or, as stated by Judge Learned Hand in Radio City Music Hall Corp. v. United States, 135 F.2d 715 (2d Cir. 1943), a & 717. "The test lies in the degree to which the principal may intervene to control the details of the agent's performance . . ."

■ Courts have applied the tests in a number of differing factual situations and under various statutes. In some cases the Courts may have given a so-called liberal construction because the law was created for remedial or beneficient purposes. This is true, for example, of social security legislation which is intended to give citizens some protection against the hazards of old age and lack of income. This, however, is not the case in the application of the tax laws where deductions or subtractions from income are said to be a matter of legislative grace and are to be strictly construed.

We start with the fact that most professional people are independent contractors who offer their services to a variety of individuals and associations. Increasingly, however, professionals are becoming salaried employees and it is estimated that about one-third of all doctors are now salaried doctors. For the most part they work for one employer, a governmental entity, a government or other hospital, a penal or mental institution, a research foundation, a corporation, etc. In this employment situation the principal recognizes itself as an employer and the professional knows that he is an employee, and an employer-employee relationship is purposely entered into. This salaried professional is generally subject to the same rules and regulations as are other employees in the organization and has the same fringe benefits. He is subject to deductions for social security tax, withholding tax, etc. He remains, however, a professional person and generally does his work in his own way. His immediate superiors may be managers, officers, trustees or directors who may not be professionals and cannot pretend to know the details of the work and perhaps cannot measure the result.

In current hospital practice radiologists differ from other doctors who deal directly with the patient. The radiologist in the hospital consults with the attending physician. The hospital must provide a continuing radiology service. The equipment cost is substantial and the equipment must be available at the hospital. To all doctors the hospital furnishes certain facilities but for the radiologist the hospital furnishes much more.

Perhaps the right to control the details or means by which the result is to be accomplished is a test which can be overemphasized where the relationship affects professional persons. Even the trained and skilled hospital superintend-

ent is unable to do this. Here, as plaintiff admitted, the Hospital could not control or supervise his work. Assuming that as to professionals the test is not proper, the Court's findings indicate that the employer-employee relationship did not otherwise exist. The Court of Appeals for the Eighth Circuit in Saiki v. United States, 306 F.2d 642 (8th Cir. 1962), reviewed the law in this area and the Court feels that its decision is supported by that decision.

The Court believes that it is possible for a hospital and a doctor to create an employer and employee relationship. Such a relationship did not, however, exist here in the years in question. In plaintiff's first relationship with the Hospital, Dr. Idstrom talked to him on a "salary" perhaps for the assurance to plaintiff that he would have some form of minimum income. As time went on plaintiff followed a natural progression and by 1961 became a full fledged member of the Radiology Department with an equal division of profits.