M. F. A. MUTUAL INSURANCE COMPANY, Plaintiff,

v.

UNITED STATES of America, Respondent.

No. 1380.

United States District Court,
W. D. Missouri, C. D.

July 9, 1970.

Harold S. Cook, Cook, Murphy, Lance & Mayer, D. Jeff Lance, St. Louis, Mo., for plaintiff.

Calvin K. Hamilton, Asst. U. S. Atty., Kansas City, Mo., John DeBruyn, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for respondent.

JOHN W. OLIVER, District Judge.

I

This is an action for the recovery of employment taxes paid under the Social Security Act on account of compensation paid by plaintiff insurance company during the calendar years 1962–1965 to its "financed agents." The basic question presented is whether those financed agents were, under the factual circumstances and the applicable statutes and regulations, employees or independent contractors.

We find and conclude that such financed agents were employees under the findings of fact stated in part II, the conclusions of law stated in part III, and for the reasons stated in our memorandum opinion in part IV. The additional findings and conclusions made in that memorandum opinion supplement those made in parts II and III and shall be so considered pursuant to Rule 52(a) of the Rules of Civil Procedure.

II

FINDINGS OF FACT

1. The Court finds the facts as contained in the Stipulation of Facts.

2. The Agent's Agreement (Ct. Exh. 1) and the Agent Financing Agreement (Ct. Exh. 2) signed by Paul Lamberson was typical of like agreements signed by other financed agents of the plaintiff.

3. The amount of the monthly advance made by plaintiff to its financed agents was fixed by plaintiff from a budget form submitted by each financed agent after consultation between him and his district sales manager before the Agent Financing Agreement was executed. The maximum monthly advance to any financed agent during the years 1962 to 1965, inclusive, was $600 and the minimum $100.

4. The term specified in the Agent Financing Agreement was for one year. The Agent Agreement, however, could be terminated at any time upon written notice from either the agent or the plaintiff (Ct. Exh. 1, para. 12). The Agent Financing Agreement was automatically terminated upon the termination of the Agent Agreement (Ct. Exh. 2, para. 6).

5. The financing of an agent was a temporary program intended to tide him over until he could build up his own commissions. The purpose of the arrangement was to increase the number of individuals who might eventually become regular agents of plaintiff by providing such persons with economic security which they otherwise did not possess.

6. The Agent Financing Agreement compensated the agent in exchange for his full-time services at a fixed rate per month (Ct. Exh. 2, para. 2) in lieu of commissions on the insurance policies he wrote and serviced (Ct. Exh. 2, para. 5(a)). Those payments were not dependent upon the product of the financed agent's work but were made in order to obtain his full time and effort.

7. Plaintiff had part-time agents and full-time agents operating solely under the Agent's Agreement. Such agents, whose status is not involved in this litigation, are sometimes referred to herein as "regular" agents to distinguish them from a "financed" agent. The Agent Financing Agreement was offered to a financed agent in order to provide him with a guaranteed income to cover his living expenses for an anticipated period of one year during which he agreed to work full-time for plaintiff.

8. Plaintiff's practice was to terminate the Agent's Agreement and the Agent Financing Agreement of a financed agent only if such financed agent was not successful in soliciting and selling insurance policies, and there did not seem to be any probability of future improvement. Termination of a financed agent could be recommended by a district sales manager or a state sales manager. Final action in regard to termination was made by plaintiff's Home Office in Columbia, Missouri.

9. In 1962 plaintiff had 35 financed agents out of 1,850 regular agents; in 1963, 77 out of 1,963; in 1964, 95 out of 2,112; and in 1965, 106 out of 1,800.

10. The blanks in Section 4 of the Agent Financing Agreement were filled by percentages based on a mathematical expectation of the production of each agent and on past experience in similar territory of the performance of other agents in similar circumstances. These percentages were goals which financed agents were urged but not required to attain. A financed agent's contract was not terminated if he failed to meet the contract percentage goals, although plaintiff had the right in such case to terminate the advances. As a matter of practice, a financed agent who was not successful in selling insurance would be terminated if plaintiff did not believe that there was any probability of future improvement. Plaintiff's authority to terminate a financed agent was not limited to any set of reasons (Ct. Exh. 1, para. 12 and Ct. Exh. 2, para. 6).

11. A financed agent was not entitled and in fact did not receive any earned commissions, even if they exceeded the advances, until the termination of his Agent Financing Agreement. If there was a balance of advances owing to plaintiff at that time, and the agent remained under contract with plaintiff, such balance would be repaid to plaintiff on a set monthly schedule agreed on between the agent and plaintiff and placed in Section 5(b) of the Agent Financing Agreement before its execution. If the agent did not remain under contract with plaintiff, such balance of advances would be repaid only out of termination payments provided in Section 13 of the Agent's Agreement.

12. Every financed agent was supposed to prepare and give to his district sales manager a daily activities report. Such reports were to be turned into his district sales manager on a weekly basis. The reports stated the names of prospects contacted, what types of insurance were offered to the prospect, and the number of new leads obtained as well as whether a new policy was written. The reports also asked for information on claims, policy changes and other services rendered (P. Exh. 3).

13. Plaintiff's district sales managers were required to summarize the information from the Daily Activity Reports of financed agents on a form entitled "Supervisor Monthly Report," and to rate such agent's performance with the others in the district and to comment on his progress. The district sales manager also met at least monthly with the state sales manager to keep him posted on the progress of a particular financed agent. The monthly reports were required to be forwarded to the Home Office, where they were periodically, but not regularly, reviewed.

14. The training sessions, both those held in the field and at the Home Office, which all agents were requested to attend, were held for the purpose of educating agents in the product to be sold and in selling techniques, and the Rules and Training Manuals furnished to all agents, whether financed or regular, were for a like purpose.

15. The financed agents were situated throughout eleven Midwestern states. The insurance business produced by a financed agent of the plaintiff or turned over to him for servicing—including the right to renewals and expirations—was the sole property of the plaintiff (Ct. Exh. 1, para. 9). The production of insurance by the agent was a necessary and integral part of the plaintiff's business. A financed agent was required,

under the Agent Financing Agreement, to devote his full time and effort to soliciting, writing, securing, and servicing insurance policies for the plaintiff (Ct. Exh. 2, para. 1) exclusively (Ct. Exh. 1, para. 10). By the nature of the business, the time and place of his solicitations were dictated by the convenience of the prospect. The financed agents of the plaintiff could operate with no appreciable investment outside of their personal automobile. Financed agents owned their own automobiles and paid all operating expenses, including insurance, in connection therewith. Plaintiff did not furnish any agent, regular or financed, with an automobile. Their respective residences served as their offices. The financed agents needed filing cabinets, a typewriter and an adding machine in his work. Office rental, advertising, transportation and other expenses were included in the computation of the monthly payment to each financed agent. The investment of a financed agent was obviously minimal. Any substantial risk of loss on the part of a financed agent was avoided because the amount of his anticipated expenses were covered by the monthly payments made under the Agent Financing Agreement.

16. Selling booths were occasionally maintained by plaintiff in discount centers or other stores, the space being leased either by the agents, financed or regular, or by plaintiff. Such booths were manned by agents requested to do so by plaintiff, and the hours during which they were open were dependent upon the hours of the store in which any such booth was located.

17. Plaintiff's district sales managers and state sales managers maintained close contact with the financed agents for the purpose of evaluating the financed agents' work and their potential capabilities. The district sales managers were responsible for recruiting, selecting, training, supervising, and motivating all agents, both regular and financed, of the plaintiff (D. Exh. 8, para. 1). They were responsible for continuous instruction to improve the knowledge, attitudes, sales skills and habits of all agents (D. Exh. 8, para. 3). The district sales manager gave financed agents more attention than the other agents.

18. Plaintiff's agents, both regular and financed, were not covered by any of plaintiff's group insurance plans, including group life, group accident and health, group major medical, group hospital and the retirement pension plan. Those circumstances, like the provision of paragraph 11 of the Agent's Agreement which states "Agent is Independent Contractor," is consistent with a relationship of independent contractor rather than employee. We find, however, that such circumstances and any others which may also be said to be somewhat consistent with the relationship of independent contractor are not controlling factors and that, on balance, under all the relevant facts and circumstances, plaintiff's financed agents must be found to be employees and not independent contractors. (Particular circumstances in particular cases tend to "offset" each other. See Azad v. United States, (8th Cir., 1968) 388 F.2d 74, at 77.)

### III

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of this action pursuant to the provisions of 28 United States Code, Secs. 1340 and 1346(a) (1) and of defendant's counterclaim pursuant to the provisions of 28 United States Code, Secs. 1340 and 1346(c).

2. The provisions of Sections 3121(d) and 3306(i), I.R.C., (26 United States Code) provide that common law rules are applicable in determining who are employees under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. Congress has indicated that such common law rules should be realistically applied.

3. In determining whether an individual is an employee for federal employment tax purposes, federal, rather than State, law is applicable. Dimmitt-

Rickhoff-Bayer Real Estate Co. v. Finnegan, (8th Cir., 1950) 179 F.2d 882. Particularly, rules of decisions enunciated in State tort liability cases are not determinative of the questions presented in this case.

4. Treasury Regulations on Employment Tax (1954 Code) relating to the Federal Insurance Contributions Act, Sec. 31.3121(d)–1(c) (2), sets forth the traditional common law tests to be applied in determining whether the relationship of employer and employee exists. Additional factors to be given appropriate consideration are stated in Restatement (2d) Agency, § 220. See Saiki v. United States, (8th Cir., 1962) 306 F.2d 642.

5. Application of the appropriate common law principles to the facts of this case requires that we conclude that plaintiff's financed agents were employees within the meaning of the applicable statutes and regulations for the reasons more fully stated in our memorandum opinion.

6. The fixed monthly payments paid plaintiff's financed agents, as provided in the Agent Financing Agreement, was not "remuneration solely by way of commission," within the meaning of the applicable law. The Federal Unemployment Tax Act, which excludes employment of insurance agents from coverage under 26 United States Code § 3306(c) (14), provides:

Sec. 3306. *Definitions*.

\* \* \* \* \* \*

(c) *Employment*. For purposes of this chapter, the term "employment" means \* \* \* any service, of whatever nature, performed \* \* \* by an employee for the person employing him \* \* \* except \* \* \*

\* \* \* \* \* \*

(14) Service performed by an individual for a person as an insurance agent or as an insurance solicitor, if all such service performed by such individual for such person is performed for remuneration solely by way of commission; \* \* \*

Treasury Regulations on Employment Taxes (26 C.F.R.):

Section 31.3306(c)(14)–1 Services of insurance agent or solicitor:

(a) Services performed for a person by an employee as an insurance agent or insurance solicitor are excepted from employment, if all such services performed for such person by such individual are performed for remuneration solely by way of commission.

(b) If all or any part of the remuneration of an employee for services performed as an insurance agent or insurance solicitor for a person is a salary, none of his services performed as an insurance agent or insurance solicitor for such person are excepted from employment, and his total remuneration (for example, salary, or salary and commissions) for such services is included for purposes of computing the tax.

The payments made plaintiff's financed agents under the agreement (Ct. Exh. 2) were not in fact related to the amount of premiums earned, but were paid pursuant to that agreement in a fixed amount on a regular basis. The amounts paid simply cannot be said to have been paid "solely by way of commission" within the meaning of Section 3306(c) (14) under the facts as we have found them.

7. Defendant is entitled to have judgment on its counterclaim as provided in paragraph 3 of the Special Pretrial Order and the plaintiff's complaint and causes of action should be dismissed.

IV

MEMORANDUM OPINION

The parties have stipulated that the questions of law and fact presented are whether plaintiff's financed agents are:

(a) Employees for purposes of the Federal Insurance Contributions Act within the meaning of 26 U.S.C. § 3121(d) and the Federal Unemployment Tax Act within the meaning of 26 U.S.C. § 3306(i); and

(b) If they are employees under 26 U.S.C. § 3306(i), then whether they are remunerated solely by way of commission within the meaning of 26 U.S.C. § 3306(c) (14).

There is no real dispute about the principles of law to be applied. The parties agree that common law principles are applicable in that the Congress effectively rejected the "economic reality test" articulated in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L. Ed. 1757 (1947) and Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L. Ed. 1947 (1947).[1] It is important to note, however, that Congressional action in that regard did not attempt to change what the Supreme Court has said in regard to how the applicable common law principles were to be applied.

Section 1 of the Joint Resolution of June 14, 1948, c. 468, 62 Stat. 438, which rejected a portion of the rationale of United States v. Silk, stated that an individual's status would be determined "under the usual common law rules." The Senate Committee Report (S.Rep. No.1255, 80th Cong., 2d Sess., p. 7) made clear, however, that "the usual common law rules" were to be "realistically applied" in the determination of whether "a person is an 'employee' for purposes of applying the Social Security Act." [2]

The Senate Committee report indicated that the Congress considered the "economic reality test" articulated by the Supreme Court to be a "new rule of nebulous character" and that all uncertainty in the determination of whether a particular individual was an independent contractor or an employee would vanish if only common law principles "distilled from many decisions by many courts" were applied to factual situations as they arose.

The problem presented does not yield to such an apparently simple solution. For Mr. Justice Rutledge pointed out in National Labor Relations Board v. Hearst Publications, 322 U.S. 111 at 120, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), four years before Congress passed its Joint Resolution of June 24, 1948, that the assumption that "there is some simple, uniform and easily applicable test which the courts have used * * * unfortunately * * * is not true." [3]

---

1. See Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, *supra*, upon which both parties rely. And see and compare Bissell v. McElligott, (W.D.Mo., 1965) 248 F.Supp. 219, aff'd. 369 F.2d 115, for the complications which result under statutes which require acceptance of State law as a part of a Congressional Act.

2. A Conference Committee Report in 1950 (H.Conf.Rep.No.2771, 81st Cong., 2d Sess., p. 104) reiterated the Congressional intent that a "restricted view of the employer-employee relationship should not be taken in the administration of the Federal old-age and survivors insurance system in making coverage determinations." Congress again cautioned in that report against a narrow application of "the test for determining the relationship laid down in cases relating to tort liability and to the common law concept of master and servant."

See also Titanium Ores Corporation v. United States, (D.Md., 1962) 205 F.Supp. 606 at 610, which concludes that the legislative history of the Joint Resolution of June 24, 1948, requires that the common law rules must be "realistically construed."

3. See also that portion of Board v. Hearst Publications, which states: "Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent, entrepreneurial dealing. This is true within the limited field of determining vicarious liability in tort. It becomes more so when the field is expanded to include all of the possible applications of the distinction."

For a collection of the irreconcilable results by many courts dealing with apparently similar factual situations involving insurance agents, see the annotation "Liability of Insurance Company for Negligent Operation of Automobile by Insurance Agent or Broker," 36 A.L.R.2d 261. The fact that the Supreme Court of Missouri, in Glynn v. M.F.A. Mutual Ins. Co., 363 Mo. 896, 254 S.W.2d 623 (en banc 1953) held that a regular agent of plaintiff was not an employee in a tort

In like manner, Mr. Justice Reed pointed out in United States v. Silk, *supra*, that "the problem of differentiating between an employee and an independent contractor, or between an agent and an independent contractor, has given difficulty through the years before social legislation multiplied its importance" (331 U. S. at 713, 67 S.Ct. at 1468). He recognized that because Congress had not specifically defined an "employee" that it probably was quite impossible to extract from the statute "a rule of thumb to define the limits of the employer-employee relationship." Nevertheless, he made clear that "as the federal Social Security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose." [4]

In Saiki v. United States, (8th Cir., 1962) 306 F.2d 642, our controlling court determined that the Regulations serve as "a guideline as to those who are employees." The parties agree that the applicable regulations fairly articulate the usual common law principles. *Saiki* likewise determined that still additional factors to be considered are those set forth in the Restatement (2nd) Agency § 220. And *Saiki* recognized that cases in which common law tests were applied in disputes arising under the Labor Act are persuasive of the determination in close cases arising under the Social Security Act. See footnote 4, p. 651 of 306 F.2d.

We do not think that a reiteration of the applicable common law principles as stated in the sources identified in *Saiki*

is particularly helpful in the determination of this case. Judge Sanborn appropriately stated in Site Oil Company of Missouri v. N.L.R.B., (8th Cir., 1963) 319 F.2d 86 at 91, that "About all that the cases demonstrate is that the test for determining the status of workers is much easier to state than it is to apply, and that each case must stand or fall on its own peculiar facts." We believe, however, that cases dealing specifically with factual situations involving the insurance industry are helpful. Those cases have quite clearly indicated that a regular insurance salesman may in most cases be said to be an independent contractor but that in most cases involving a "debit" insurance agent, such an agent must be said to be an employee. There is still a third type of insurance agent illustrated by cases such as National Labor Relations Board v. Phoenix Mut. L. Ins. Co., (4th Cir., 1948) 167 F.2d 983, cert. denied 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395. The *Phoenix* case, on its facts was, as is this case, much closer to the dividing line between the other two types of insurance agents and, as we will note later in detail, presented a factual situation in which an agent other than a "debit" agent must also be considered to be an employee rather than an independent contractor.

Judge Frank determined in Zipser v. Ewing, (2d Cir., 1952) 197 F.2d 728, under the facts there presented, that the insurance agent there involved was not an employee. Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan was cited and relied upon to support that finding.[5]

---

case is conceded by plaintiff not to be controlling in this case.

4. See also Mr. Justice Rutledge's concurring opinion in which he stated "Certainly the question of coverage under the statute, as an employee, should not be determined more narrowly than that of employee status for purposes of imposing vicarious liability in tort upon an employer, whether by application of the control test exclusively or of the Court's broader ruling." The common law principles articulated in United States v. Silk, as

distinguished from the "economic reality test" enunciated therein, are still controlling. See Enochs v. Williams Packing Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 1127, 8 L.Ed.2d 292 (1962), for a relatively recent application of those common law principles as stated in United States v. Silk.

5. The controlling facts were stated as follows: "The company did not and, under the agreement, could not have required the agent to work full time for it, canvass any particular territory, or, with any

We direct attention to two cases which illustrate that debit agents have, under the particular facts presented, been considered to be employees rather than independent contractors. The debit agent involved in Capital Life & Health Ins. Co. v. Bowers, (4th Cir., 1951) 186 F.2d 943, was held to be an employee within the meaning of the Social Security Act. Dimmitt-Rickhoff-Bayer Real Estate Co. was distinguished on its facts.[6] N. L. R. B. v. United Insurance Co., 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968), applying common law standards in a Labor Act case, held that the Labor Board had properly determined a debit agent to be an employee. Mr. Justice Black emphasized that "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in the light of the pertinent common-law agency principles."

National Labor Relations Board v. Phoenix Mut. Life Ins. Co., *supra*, involved factual circumstances in which the incidents of the relationship between the insurance company and the agent were different from those presented either in *Zipser* or in *Capital Life & Health Ins. Co.* and *United Insurance Co.* Phoenix Mutual Life apparently was the first life insurance company to cancel all of its part-time agents and to insist that all its agents "devote their full business time to Phoenix" (167 F. 2d at 987). In so doing, that company went so far as to furnish its agents "with office space, a. desk, a telephone, stenographic service, stationery, postage, filing cabinets, sales supplies and business cards" (167 F.2d at 986). It also paid for its agents' bonds and license fees as required by the State of Illinois. And it required its agents to produce a specified minimum of new business each year or be discharged. A retirement and pension plan was also provided for the Phoenix agents.

We recognize that none of those particular factual circumstances are present in this case. But many of the other factors present in *Phoenix* are present in this case in a form not substantially different from those which the court found to be significant in that case. This is apparent from the following statement of the court in *Phoenix*:

To be selected as an insurance salesman, it is not necessary for the applicants to have previous experience at selling insurance. After an applicant is selected and after signing an agency contract, each is given an intensive training by respondent's supervisory staff. * * * During the first two years of their service they are known as junior salesmen and as such may operate under a financing contract rather than a regular commission contract. Under such a contract the salesman may borrow $100.00 up to as much as $300.00 a month. These loans are in the nature of advances on

---

particular frequency, contact any particular prospect, use any particular sales technique, require regular reports, confine himself to selling a particular amount or kind of policy. Zipser did not even have a minimum quota to sell during the year."

6.. The controlling facts in that case were stated as follows: "when all the circumstances of the present controversy are examined, it becomes obvious that the seeming freedom from control of the commission agents is lacking in reality, and that they are in fact as completely subject in all material respects to company direction as the salaried agents whose employee status under the statute is not questioned. Long experience of the taxpayer and other companies in this field has resulted in the adoption of methods and forms best suited to the business which leave little discretion to the agents, while the diligence and industry required to collect the small weekly premiums on hundreds of policies and to write new business to keep the debit at a proper volume compel the agent to spend so much time in his debit area and to report his activities and account for his collections at the office so frequently as to leave him little freedom of action." [186 F.2d at 945]

commissions which the salesman is expected to earn. After they become senior salesmen they no longer are entitled to borrow under a financing contract but receive other benefits or inducements which encourage them to remain permanently with the respondent.

The evidence before the Board discloses that respondent keeps a close check on the details of its salesmen's work and exercises a large measure of control over them. Each salesman must furnish management regularly with an accurate daily record of interviews and sales, must show for each day of the week the number of hours worked in the field, the number of interviews had, the number of new prospects interviewed and many other similar details. [167 F.2d 986–987].

The Seventh Circuit appropriately stated in *Phoenix* that the insurance company "regarded its salesmen as being in a somewhat different class than ordinary insurance salesmen" (167 F.2d at 987). In this case the plaintiff regarded its financed agents in a somewhat different class than its regular agents. In regard to plaintiff's financed agents, as distinguished from its regular agents, there are added factors which are consistent only with an employee status. All of the factors deemed significant in the quotation from *Phoenix* are present in substance in this case.

In this case, as in *Phoenix*, plaintiff had power to exercise effective control over its financed agents pursuant to its requirement of filing reports upon which evaluations of its financed agents were based. Undoubtedly, a particular financed agent's future with plaintiff was at least partially determined by what appeared on the reports and their evaluation. Plaintiff suggests that the financed agents' reports "often were handed in sporadically." We do not believe that the significance of the daily reporting requirement can be so easily deflated. That requirement, of course, is not a controlling factor but its existence is totally inconsistent with the notion that plaintiff was disinterested in the infinite details of its financed agents' activity or that plaintiff, as expressed in its Manual, did not intend to exercise its management powers over how the details of their financed agents' work were to be executed.

Every case involving these questions must be decided on its own facts. The factual situations in the reported cases are never precisely similar. On the other hand, the adjudicated cases which we have reviewed indicate that under all the facts and circumstances of this case, the relationship between plaintiff and its financed agents must be determined to be that of employer-employee, rather than that of independent contractor. The full factual situation presented in this case has much more in common with those presented in *Phoenix* and the debit agent cases than with *Zipser*. We so find and conclude.

There is a deceptive simplicity in the tendency of courts to deal with questions presented in this case by articulating the "control test" as though the statement of that simple formula renders its application easy. The Eighth Circuit in *Saiki* quoted Judge Learned Hand's opinion in Radio City Music Hall Corp. v. United States, (2d Cir., 1943) 135 F.2d 715, 717, which recognized that the Internal Revenue Regulations were "really no more than a gloss upon the definition contained in Justice Gray's opinion in Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 33 L.Ed. 440 (1889)." *Saiki*, however, appropriately recognized that the "control test" was not one of simple application and utilized the more objective criteria stated in the Restatement.[7]

---

7. The addition of more objective criteria in the Restatement than the "control" and the "right to control" test does not remove all the difficulties. See Mr. Justice Rutledge's comment in Board v. Hearst Publications, *supra*, "The so-called 'control test' with which common-law judges have wrestled to secure precise and ready applications did not escape the difficulties encountered in borderland

Consistent with the approach taken by our controlling court in *Saiki* in regard to the various factors set forth in § 220 of the Restatement (2d) Agency, we consider the factual circumstances incident to each of those factors in the order listed in § 220(2):

(a) Plaintiff could and did exercise by way of concrete suggestions and required procedures, a considerable amount of control over the details of the work of its financed agents, particularly as evidenced by its demand for daily reports concerning the full time activities of its financed agents and by the presence of its absolute power of termination.

(b) The financed agents were engaged in the business of selling plaintiff's insurance policies. Such an occupation or business cannot fairly be said to be distinct from that of plaintiff's business; indeed, the sale of insurance policies is but one phase of plaintiff's business.[8]

(c) The work usually done by the financed agents could, in one sense of the word, be done by a "specialist without supervision." But such a view would ignore the fact that the work of a financed agent could just as well be done by a salaried employee under the direction of the employer. A financed agent, like the "junior salesmen" in *Phoenix,* was in a process of training which required that much of his work be done under the direction and supervision of plaintiff's district sales manager.

(d) No specialized skill other than of a salesman was required to become a financed agent. An insurance salesman must, of course, as must any other salesman, learn something about the product he is selling. But the occupation of an insurance salesman does not involve the sort of specialized skill required, for example, of the chicken sexers involved in *Saiki* or the radiologist in *Azad.*

(e) Plaintiff supplied many forms and business "tools," such as forms of policies, and the like, to its financed agents. A financed agent's place of work, as any insurance salesman, was among members of the public wherever he may catch them. The circumstance of whether an insurance salesman's desk, typewriter, filing cabinet, adding machine, and the like, are located in his home or in an office furnished by the insurance company (as was the circumstance in *Phoenix*) is not a particularly weighty factor in the determination of the relationship question because it is obvious that sales of insurance policies infrequently occur at either place.

(f) Plaintiff's financed agents were employed for a year but plaintiff retained complete control over the employment tenure of a financed agent;

---

cases by its reformulation in the Restatement of the Law of Agency § 220." [322 U.S. 120, 64 S.Ct. 855]. And see Judge Larson's comment in regard to the particular individual involved in Azad v. United States, *supra*, (D.C.Minn., 1966) 277 F.Supp. 258, 265, aff'd. 8th Cir., 1968, 388 F.2d 74, in which he stated that "the *right of control* * * * is a test which can be over-emphasized" and in which he concluded that the rationale stated in *Saiki* supported his final conclusion in that case.

8. The business of an insurance salesman cannot properly be viewed as a series of separate sales transactions. His relationship to his company is dependent on

the making of numerous sales and his performance is evaluated accordingly. We reject plaintiff's implicit argument to the contrary for the reasons stated in Titanium Ores Corporation v. United States, *supra*, 205 F.Supp., at 611: "Plaintiff's arguments * * * that each sale of stock should be treated as a separate transaction, * * * are rejected. * * * The record is clear that Mr. Brockman was employed for an overall project. There is a conspicuous lack of evidence that the parties either negotiated or intended to negotiate a new contract between them each time that Mr. Brockman was successful or unsuccessful in persuading one of plaintiff's stockholders to buy additional shares of stock."

he could be discharged at any time for any or no reason at all.[9]

(g) A financed agent was, in effect, given a guaranteed draw and the amount of money received was not related to the job performed. The money was paid to obtain the full time services of the financed agent; indeed, the system of reporting was designed to make certain that plaintiff received what it paid for. As long as plaintiff did not elect to terminate, the financed agent was entitled to be paid the amount specified in his agreement. The fact that plaintiff's right to terminate was in no way restricted to how its financed agents performed a specific and particular job (in the sense of selling a particular insurance policy to a particular prospect) is totally inconsistent with the basic concept of an independent contractor relationship.

(h) The sales work performed by the financed agents was a regular part of the general insurance business of the plaintiff. Such work could as well be performed by a salaried employee as by a financed agent.

(i) The contract recited a relationship of independent contractor, but, under all the cases, this single factor is not controlling.

(j) Plaintiff, of course, is in the insurance business, a part of which includes the sale of its policies.

Our discussion of the matters of fact incident to the ten factors stated in § 220(2) requires, under the standard stated in § 220(1), that we conclude that plaintiff's financed agents are employed to perform sales services in plaintiff's affairs under circumstances in which the performance of those services is subject to plaintiff's right of control. None of the separate factors are fully supportive of plaintiff's contention that its financed agents are independent contractors. All the facts and circumstances, when considered as a whole, make it clear that plaintiff has retained the requisite right, on a full time basis, to control the details and means by which its financed agents are to conduct their sales activity.

We have explicitly and intentionally stated our conclusion under the rationale of § 220 in its term of "right of control" rather than in its term of "actual control." That conclusion is consistent with our controlling court's like articulation of the applicable commonlaw standard as stated in Cody v. Ribicoff, (8th Cir., 1961) 289 F.2d 394. Judge Matthes' opinion reversed the Secretary's ultimate finding that "Dr. Cody was not an employee" because "the referee did not comprehend that as to the issue of control, it is the *right* of control and not the *exercise* of control which is important" (Judge Matthes' emphasis, 289 F.2d at 398).

Perhaps one of the most significant, although not completely controlling, factors which is consistent only with an employer-employee relationship is the manner and method under which plaintiff pays its financed agents. The fact that the independent contractor salesman in illustration 7 under comment k of § 220(2) of the Restatement was "paid by commission" was obviously considered to be a significant factor in distinguishing

---

9. Judge Winter, in Titanium Ores Corporation v. United States, *supra*, 205 F.Supp., at 610, applied § 220 of the Restatement and noted that the company had retained "the right to discharge" the salesman involved in that case. After stating that "the right to control, rather than the fact of actual control, is what is decisive," Judge Winter added: "That plaintiff retained ultimate control—the right to discharge—was admitted by plaintiff's president in response to the Court's question.

This factor alone does not always spell out the right to control, as plaintiff argues. McGowan v. Lazeroff, 148 F.2d 512 (2 Cir. 1945). Coupled with the other factors recited above pointing to the conclusion that Mr. Brockman was an employee, the right to discharge meant a far greater right to control than that customarily exercised over an independent contractor." [205 F.Supp. 611] We agree.

that illustration from illustration 6, in which the full time salesman who was furnished a car was considered an employee.

The case law is consistent with the Restatements illustrations. Ewing v. Vaughan (4th Cir., 1948) 169 F.2d 837, applied common law principles to the facts there presented. Judge Prettyman, in holding that the flour salesman was not an employee, directed attention to the fact that "he had no guaranteed minimum and was not allowed a draw account or an advance of any kind against his commissions." In similar fashion, Judge Winter in Titanium Ores Corporation v. United States, *supra*, 205 F.Supp., at 606, in determining that the salesman there involved was an employee within the meaning of the Social Security Act, took note of the fact that "Mr. Brockman was paid $300 per week guaranteed drawing account, together with hotel expenses while in the Silver Spring-Baltimore area" until March 17, 1956, and that between that date and "until the termination of his services on September 13, 1956 he received a $200 guaranteed weekly drawing account."

And finally, the Congressional treatment given the matter of an insurance agent's remuneration *solely* by way of commission in Section 3306(c) (14) supports the idea that the circumstance of how plaintiff paid its financed agents is a significant factor in the determination of the existing relationship. That section found its way into the law by way of the 1939 Amendments to the Social Security Act. The legislative history, see House Report No. 728, 76th Cong., 1st Sess., is not very illuminating. We would assume, however, that the purpose of that amendment was to make certain that no insurance agent or insurance solicitor would be excluded from Social Security coverage unless he, at the very least, received all of his remuneration solely by way of commission.[10]

It should be understood, of course, that our detailed discussion of plaintiff's method of payment of its financed agents and the cases which discuss that same factor, does not mean that we consider that factor to be controlling. We do think that particular factor is a significant one for the reasons stated in those cases and because the method of payment involved in this case is highly inconsistent with the usual and familiar relationship of independent contractor.

■ For the reasons stated, we conclude that under the applicable common law principles stated, plaintiff's financed agents are employees within the meaning of the statutes and regulations involved. Plaintiff's claim for refund must therefore fail and judgment should be entered for the defendant on its counterclaim in accordance with the stipulation of the parties. It is therefore

Ordered that the Clerk shall enter an appropriate judgment against the plaintiff and for the defendant in accordance with paragraph 3 of the Special Pretrial order.

10. This would not necessarily evidence any Congressional intention that all insurance agents should be considered as employees unless they receive all their remuneration solely by way of commission. We think, however, that the least that can be said is that the isolation of the factor of commissions, and the explicit requirement that exclusion is dependent upon the circumstance that commissions must be an insurance agent's *sole* remuneration supports the idea that the Congress considered the circumstance of whether and how much an insurance agent is paid by way of commission to be a most important and significant factor in determining whether an insurance agent is or is not covered by the Social Security Act.