**FUQUA NATIONAL, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**J. B. FUQUA and Donald MacDonald, as Trustees for WJBF Employees Profit Share and Retirement Trust, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 1390, 1391.**

United States District Court, S. D. Georgia, Augusta Division.

Dec. 2, 1971.

Sanders, Hester, Holley, Askin & Dye, Augusta, Ga., for plaintiffs.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Johnnie M. Walters, Asst. Atty. Gen., John F. Murray, James M. Stabler, Attys., Dept. of Justice, Washington, D. C., for defendant.

## ORDER

LAWRENCE, Chief Judge.

In these actions plaintiffs sue to recover income taxes paid under protest following disallowance of deductions in connection with an Employees' Profit Share and Retirement Trust. The Commissioner ruled that the Trust had engaged in a prohibited transaction during the fiscal year 1958–1959 and that it thereby lost its status as an exempt organization.[1]

The transaction concerned was the alleged loan of trust corpus to the employer-creator, Georgia-Carolina Broadcasting Company (now Fuqua National, Inc.) without adequate security. See 26 U.S. C.A. §§ 501, 503(a), (b), (c). The Commissioner's ruling as to the nondeductibility of contributions by Fuqua and the taxability of income of the Trust resulted in deficiency assessments of $14,040 against Fuqua and $946.46 against the Trust. The plaintiffs seek refunds. Defendant has moved for summary judgment.

The background of the controversy is as follows:

In the early 1950's Georgia-Carolina Broadcasting Company (Fuqua) issued and sold preferred stock to a select group of persons. Dividends of approximately 9 percent were regularly paid. After the profit sharing-retirement trust was organized the Trustees thereof acquired 1,470 shares of the preferred stock of the corporation. The issue was called for redemption by Fuqua in September, 1958. Some of the stockholders were paid in cash while others preferred to take 6 percent notes. The Trustees desired an interest-bearing asset in the Trust portfolio. Fuqua paid $4,982 in cash to the Trust for 470 shares and for the remaining redeemed shares gave the latter a 6 percent promissory note maturing twelve years after date in the amount of $16,600.

The Commissioner ruled that the acceptance of the unsecured note by the Trust was a "prohibited transaction" under 26 U.S.C.A. § 503(b) (1). It provides that the term "prohibited transaction" means any transaction in which an organization subject to the section "lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest . . . to the creator of such organization (if a trust)." The Regulations (26 C.F.R. 1–503(c)–1(b)) define "adequate security" as "something in addition to and supporting a promise to pay, which is so pledged to the organization that it may be sold, foreclosed upon, or otherwise disposed of in default or repayment of the loan. . . ." Defendant cites Van Products, Inc. v. Commission, 40 T.C. 1018 (1963) in which the Tax Court ruled that a loan to the employer-creator of the trust made in exchange for the unsecured promissory note of the borrower is not a security or secured and that the solvency of the exempt organization is immaterial.

The plaintiffs contend that the profit sharing Trust did not "lend" income or corpus within the meaning of § 503(b) (1). They argue that the Trust acquired the debt obligation of Fuqua by a stock redemption over which the former had no control and that the facts present an entirely different situation from the normal loan transaction where one party gives up a portion of its capital and the

---

1. The deductions were disallowed for the fiscal year ending June 30, 1963, which was the first taxable year after the Commissioner became aware of the prohibited transaction and gave notice to the exempted organization of the alleged violation.

other receives an amount of cash denominated as a loan. Plaintiffs say that the Trust advanced no funds and that Fuqua neither received any nor needed any. I will come back to this argument after considering the second contention of the taxpayers.

■ Plaintiffs also maintain that the note is not a prohibited transaction under § 503(e). That section provides that an evidence of indebtedness shall not be treated as a loan made without the receipt of adequate security of the obligation if it is acquired directly from the issuer at a price not less favorable to the Trust than the price currently paid for a substantial portion of the same "issue" by persons independent of the issuer and, among other things, if not more than 25 percent of the assets of the Trust, following acquisition of the obligation, shall be invested in obligations of the creator. Plaintiffs contend that all the requirements for the exception have been met and argue:

> "The Trust received one note in the amount of $10,600. During the 1958 period of reorganization purchases and redemptions, other individuals received at least $300,000 in other notes. Therefore, the Trust held only 3.5% of the aggregate amount of such obligations. The 3.5% figure is well within the 25 percent maximum allowable."

I do not read § 503(e) (3) the way they do. That paragraph requires that immediately following acquisition of the obligation not more than 25 percent of the assets of the Trust shall be invested in obligations of the creator. Plaintiffs fail this test. The balance sheet of the Trust as of June 30, 1958, showed that the preferred stock of Fuqua held by it represented $16,162 of total assets of $26,284.72. Following redemption and cash payment for 470 re-

deemed shares in September of that year, the portfolio included the $10,600 note which was part of total trust assets of around $27,000. That is what is reflected by the balance sheet as of June 30, 1959. There is nothing in the record to support any conclusion other than that the promissory note amounted to approximately 40 percent of the trust assets upon acquisition and during the fiscal year in question.

■ I return now to the taxpayer's main contention, namely, that the Trust did not loan any of its corpus to Fuqua within the intended meaning of the word "lends" in the statute. I disagree. The stock was a security securing the accompanying obligations of the issuer. The promissory note given by Fuqua in exchange for the redeemed shares was neither security nor secured but was a naked promise to pay the redemption price twelve years hence. No "debt" existed prior to September 30, 1958, in the conventional sense of the word. A debt arose when the creator kept the $10,600 owed for the surrendered stock. In effect, that amount was loaned to Fuqua.[2] In the substance of things, I see no difference between what actually occurred and if Fuqua had redeemed the stock by cash payment and then borrowed the identical sum on the basis of its promise to pay later. A loan may be implied and such transactions must be viewed according to their real nature rather than mere form. 54 C.J.S. Loan p. 655. It is difficult for me to comprehend how a promissory note given "For Value Received" evidences a debt but not a loan. A forbearance to accept immediate payment of a debt is an extension of credit.

To quote Uncle Remus, "Hit look lak sparrer-grass, hit smell lak sparrer-grass, hit tas'e lak sparrer-grass, en I bless if 'taint sparrer-grass."[3]

---

2. Statutes granting tax deductions or exceptions are generally to be strictly construed. James v. United States, D.C., 176 F.Supp. 270; Crosby v. United States, D.C., 292 F.Supp. 314, affirmed 5 Cir., 414 F.2d 822; Azad v. United States, D.C., 277 F.Supp. 258.

3. Joel Chandler Harris, *Nights with Uncle Remus* (1883). Sparrow-grass is a colloquialism for asparagus.

It is to be regretted that plaintiffs must be penalized for a mere technicality; an innocent and non-beneficial oversight that was corrected as soon as the matter was brought to Fuqua's attention. However, I cannot change the law. There is no genuine issue of fact. Defendant's motions for summary judgment must be granted.