**UNITED STATES UNDERWRITERS INC., Plaintiff,**

v.

**SIMCOE & ERIE GENERAL INSUR-ANCE CO., Defendant.**

No. 80 Civ. 5562 (IBC).

United States District Court,
S. D. New York.

Feb. 5, 1982.

Rein, Mound & Cotton, New York City, for plaintiff; C. Raymond Nelson, New York City, of counsel.

Brady & Tarpey, P. C., New York City, for defendant; Edmond F. Supple, New York City, of counsel.

## OPINION

IRVING BEN COOPER, Senior District Judge.

### Introduction

This action, tried to the Court, centers on the dealings of two insurance companies, plaintiff United States Underwriters Incorporated (Underwriters) and defendant Simcoe & Erie General Insurance Company (Simcoe). Underwriters alleges that in 1967 efforts were undertaken to license Simcoe in the state of Georgia; that monies had to be deposited with the Georgia Insur-

ance Department as a security requirement; that a portion of this security requirement, $64,000, was deposited by Underwriters on behalf of Simcoe; and that the return of the monies so advanced is now due on the basis of a contract entered into on October 23, 1967 or by virtue of a separate and distinct promise to repay the debt. For its part, Simcoe denies liability whatever and affirmatively seeks to impose the applicable statute of limitations.

For reasons set forth below, we dismiss the complaint in its entirety.

### The Facts

The essential facts are not in dispute. Underwriters, a Georgia corporation, was formed in late 1966 by Joseph Fogarty (Fogarty) and Lindsey Hopkins (Hopkins) for the purpose of underwriting insurance. At the time of its formation, Fogarty was president of Associated Marine Underwriters (AMU), a concern engaged exclusively in the underwriting of ocean marine insurance. In 1966, discussions were held among the principals of AMU with a view towards expanding their business—the end result being the formation of Underwriters for the expressed purpose of handling new areas of insurance such as property and casualty.[1]

Defendant Simcoe, currently and at all times relevant herein, is a Canadian chartered insurance company dealing in marine risk insurance.

In late 1966, John C. Stradwick (Stradwick) then executive vice-president of Simcoe had several discussion meetings with Fogarty and Hopkins concerning possible business arrangements between the various companies operated by the litigants before us.[2] Stradwick testified that these discussions related to fishing vessel insurance business in the Caribbean and the Gulf of Mexico; that Fogarty was interested in establishing a "Lloyds" type market in the southeast.[3] Simcoe had contact in the Lloyds market and had done "quite a bit of business" with one Lloyds broker in particular, Robert Bradford Overseas Limited.[4]

Stradwick further testified that Fogarty and Lloyds had come to an understanding concerning their proposed business arrangement: A company "able to accept reinsurance from Lloyds" would have to issue the policies in the southeastern states in which Fogarty wished to do business.[5]

The parties finally agreed that Simcoe would act as the corporate vehicle issuing policies and reinsuring the risks in the Lloyds market. Efforts were then undertaken to license Simcoe in the southeast. Originally, attempts were made at licensing Simcoe in Florida, but for reasons never made clear at trial, a license was not secured there. Ultimately, Georgia[6] was selected as Fogarty and Hopkins had "very good connections" in that state.[7]

Sometime in the first half of 1967, Stradwick met with Mr. Bentley (Bentley) the Commissioner of Insurance for the State of Georgia to discuss Simcoe's application for a license. Stradwick testified that it was a "very, very friendly meeting" and Bentley was "quite prepared to back our application."[8]

At this initial or subsequent meeting with Bentley the subject of a security deposit was discussed.[9] The first figure mentioned for this purpose was $30,000 and Fogarty

---

1. T.T. 117–20 ("T.T." refers to the trial transcript).

2. T.T. 232–33.

3. As the term was used at trial, the "Lloyds market" referred to the insurance underwriting and brokerage enterprises centered in London where any and all risks relating to the business of fishing vessels could be insured.

4. T.T. 233–35.

5. T.T. 234.

6. T.T. 123–25.

7. T.T. 235.

8. T.T. 236.

9. The state of Georgia had a statutory security deposit requirement for both domestic and foreign insurance companies. *See* Plaintiff's Exhibit 11, pp. 8–9.

"volunteered" to put up the entire sum.[10] However, Fogarty was subsequently informed that this security requirement would amount to $125,000. Fogarty then notified Stradwick of the increase. Stradwick testified he told Fogarty that the latter's offer to cover the cost of the security deposit would now have to be increased to 50% of $125,000 ($62,500).[11]

In the spring of 1967 Fogarty and Stradwick met in Miami, Florida where continued discussions were held regarding this proposed business arrangement. Stradwick testified that he told Fogarty that he needed a sign of "good faith"; that if Fogarty would "put up" 50% of the security requirement, then in the event Simcoe made a profit "an underwriting profit based on an underwriting year account basis," Fogarty would be repaid out of such profits; that "we would share and share alike" as to the original capital; and if the venture was not successful each side would lose $62,500. Stradwick further testified that Fogarty agreed to these conditions and stated he would have his people draft an agreement to that effect.[12]

Simcoe first filed its application with the Georgia Insurance Department sometime prior to February, 1967.[13] Raymond C. Addicks (Addicks), a vice-president of Underwriters in 1967 and a former Georgia Insurance Deputy Commissioner, testified that Fogarty had informed him that Underwriters would put up funds to be applied to Simcoe's deposit; and that it was his responsibility to see that this was done in a manner acceptable to the Georgia Insurance Department.[14]

In July, 1967 Addicks established a temporary deposit with the Georgia Insurance Department by depositing with it a check for $50,000 from the Maryland National

Insurance Company and another check for $12,500 from Underwriters.[15]

Once this temporary deposit was established, Addicks testified that he then undertook, at Fogarty's direction, to purchase interest bearing securities to replace the previously deposited funds. Shortly thereafter, Addicks contacted the Fulton National Bank; purchased $62,500 worth of government bonds and registered them with the insurance department on Simcoe's behalf. Addicks further testified that to the best of his knowledge Simcoe itself deposited an additional $62,500 worth of securities bringing the total to the requisite $125,000.[16] On June 30, 1967 Simcoe received its Georgia license.[17]

Once Simcoe's license was granted, Fogarty had a proposed agreement prepared and sent to Stradwick's Canadian offices. Stradwick signed this agreement on October 23, 1967 and admitted that it was based upon the earlier discussions he had with Fogarty.[18] The agreement, in its entirety, reads:[19]

> WHEREAS the United States Underwriters Incorporated have deposited with the State of Georgia $64,000 U.S. Treasury 4¼% Notes Series D 1972 dated May 15th 1967 due May 15th 1972 as part of the deposit required in order to license the Simcoe & Erie General Insurance Company in the State of Georgia.
>
> AND WHEREAS, the said Bonds are registered in the name of the Simcoe & Erie General Insurance Company.
>
> It is hereby mutually agreed between the United States Underwriters Incorporated and the Simcoe & Erie General Insurance Company that the said Bonds will be purchased from the United States Underwriters Incorporated by the Simcoe

10. T.T. 238.

11. T.T. 241–42.

12. T.T. 242–43, 248–49.

13. T.T. 20.

14. T.T. 13; 19, 39.

15. T.T. 41–45, Plaintiff's Exhibit 3.

16. T.T. 45–50; 57–58, see Plaintiff's Exhibits 4, 5, 6.

17. T.T. 59–60.

18. T.T. 250–51.

19. Plaintiff's Exhibit 6.

& Erie General Insurance Company as and when profits of the United States operation of the Simcoe & Erie General Insurance Company will make funds available for the purchase. The purchase price to be that paid by United States Underwriters Incorporated namely 98.%₂.

The said bonds are to be considered as a loan to the Simcoe & Erie General Insurance Company and all interest accruing from these Bonds to accrue and be paid over to the United States Underwriters Incorporated.

Stradwick testified that once Simcoe was licensed in Georgia it acted as a "fronting company with participation." As Stradwick explained, Simcoe would pass along or reinsure 95% of any risk it had assumed to underwriters in the Lloyds market, retain 5% of the risk, and collect premiums on the percentage of the risk retained.[20]

The profitability of this arrangement and Simcoe's other United States operations was hotly contested at trial. Ernest Dodd, vice-president and treasurer of Simcoe & Erie Investors Limited, the parent company of Simcoe, testified that Simcoe did realize profits from its United States operations from 1967 to the present;[21] that between 1967 and 1978 Simcoe derived income from insurance business in states other than Georgia; that it is currently licensed in New York; and that it had a "surplus line" business in Florida and Alabama for several years.[22]

At trial, annual statements which were also filed with the Georgia Insurance Department were introduced setting forth records of Simcoe's business operations for the years 1967 through 1978.[23] Dodd testified that he prepared these annual statements and that they revealed income from business produced in states other than Georgia.[24]

These annual statements are broken down into several categories. They indicate Simcoe's underwriting gains and losses for its entire United States operations; and they reflect Simcoe's profits and losses for its entire United States operations. In summary, these statements reveal that Simcoe realized accumulated underwriting gains for the years 1967 through 1969 of $73,196.92, while accumulated profits for the same time period were $65,582.77.[25] A breakdown of net income or loss and net underwriting gains or losses for the years 1967 through 1978 is noted in the margin.[26]

Dodd testified that Simcoe realized profits in some years and losses incurred in later years; that reserves for losses from prior years were inadequate to cover losses incurred in subsequent years; that through 1978, Simcoe's accumulated loss was $353,820.64, offsetting any earlier gains.[27]

From October 23, 1967 (the date Stradwick signed the agreement at issue) to the present Simcoe has not paid any of the principal sum sought herein despite alleged repeated demands. Donald R. Miller (Mil-

**20.** T.T. 253, 255–56.

**21.** T.T. 169, 173.

**22.** T.T. 170–71. The term "surplus line" was never explained at trial.

**23.** Plaintiff's Exhibits 12, 13, 14; Defendant's Exhibits G, H, I, J, K, L, M, N, O.

**24.** T.T. 173.

**25.** Plaintiff's Exhibits 12, 13, 14.

**26.**

| Year | Net Income or (Loss) | Net Underwriting Gain or (Loss) |
|---|---|---|
| 1967 | $11,071.75 | $14,194.55 |
| 1968 | 5,879.63 | 237.82 |
| 1969 | 48,631.39 | 58,764.55 |
| 1970 | (8,949.00) | (47,935.00) |
| 1971 | 1,368.41 | (77,552.86) |
| 1972 | 35,113.75 | (33,610.01) |
| 1973 | (426,429.58) | (533,862.10) |
| 1974 | (66,565.99) | (171,849.36) |
| 1975 | 31,150.00 | (52,307.00) |
| 1976 | (23,539.00) | (105,475.00) |
| 1977 | 40,548.00 | (17,622.00) |
| 1978 | 1,858.86 | (62,465.81) |

**27.** T.T. 175; 195–97. Plaintiff's motion to strike testimony (see Plaintiff's Post-Trial Memorandum, pp. 38–40) regarding unrelated transactions between AMU and Simcoe is

ler), a vice-president of AMU, testified that he made several demands for payment to Stradwick, the first by letter on May 23, 1978 followed by seven or eight more written requests; that the first response (content not revealed at trial) he received was from Stradwick's attorneys on February 16, 1979.[28]

On cross-examination, Miller testified that when each of these demands was made by him he was not an officer of Underwriters but vice-president of AMU, and the letters themselves demanded payment to "us"—"us" facially appearing to be AMU.[29]

It was Stradwick's testimony that he had no knowledge of any demand made on behalf of Underwriters for the return of any portion of the monies.[30]

Even though Underwriters has not received repayment of any portion of the principal sum, the record reveals that it did receive interest payments from Simcoe on the government securities which were originally deposited. Miller testified that he received three checks from Simcoe as payment for interest: the first on June 12, 1978 for $17,640; the second on November 23, 1978 for $1,960; and the last on June 15, 1979 for $1,960.[31]

For reasons not made clear at trial, Simcoe surrendered its Georgia insurance license on July 1, 1979.[32] However, it continues to generate business in several other states.[33]

### The Law

Plaintiff argues that it is entitled to the monies advanced for Simcoe's security deposit ($64,000) on several theories: (1) the memorandum signed by Stradwick is a binding non-conditional contract and any language capable of being construed as conditional merely fixes a future event as a

convenient time for repayment; (2) even if the agreement is construed as conditional, the condition has been met; (3) an obligation separate and apart from the written agreement to repay can be implied from all the circumstances here; and (4) Simcoe by surrendering its Georgia insurance license in 1979 has rendered fulfillment of this agreement impossible, breaching an implied contractual promise to remain in business.

For its part defendant argues: (1) plaintiff has failed to sustain its burden of proving the existence of a transfer of monies or loan, or that any implied promise to pay exists; (2) the agreement of October 23, 1967 is conditional and the condition has not been met; and (3) any claim for relief is barred by the applicable statute of limitations.

The first step necessary to our analysis is to determine whether the agreement (exhibit 6) is conditional. In relevant part it reads:

> "... said bonds will be purchased from United States Underwriters, Incorporated by the Simcoe & Erie General Insurance Company *as and when profits of the United States operation of the Simcoe & Erie General Insurance Company will make funds available for the purchase.*" (emphasis ours)

Georgia law is clear: "The cardinal rule of construction is to ascertain the intention of the parties. If that intention be clear, and it contravenes no rule of law, and sufficient words be used to arrive at the intention, it shall be enforced, irrespective of all technical or arbitrary rules of construction." Ga.Code § 20–702.

As one Georgia court has stated:

> "Every other rule is subservient to this one. 'The fundamental rule, the rule which swallows up almost all others in

granted. See T.T. 249–51. *See Kirtley v. Abrams,* 299 F.2d 341 (2d Cir. 1962).

**28.** T.T. 142–45. Defendant's motion to strike this testimony (see Defendant's Post-Trial Reply Memorandum, pp. 25–26) as irrelevant is denied.

**29.** T.T. 149–50.

**30.** T.T. 252.

**31.** T.T. 141–42.

**32.** T.T. 62.

**33.** T.T. 170.

construing a paper, is to give it that meaning which will best carry into effect the intent of the parties. This is the object of the rules of interpretation, to discover the true intent of the parties, and in doing this we are to take the whole of [the instrument] together, and to consider this with the surrounding circumstances.'"
*Brooke v. Phillips Petroleum Co.,* [113 Ga.App. 742] 149 S.E.2d 511, 513 (Ga.Ct. App.1966) (citation omitted); *accord, Pittsburg Coke & Chemical Co. v. Bollo,* 421 F.Supp. 908, 928 (E.D.N.Y.1976) (construing New York law), *affirmed,* 560 F.2d 1089 (2d Cir. 1977).

Here we find that "intent" from the plain meaning of the words of the agreement. Ga.Code § 20–704(2); *accord, Laba v. Carey,* 29 N.Y.2d 302, 327 N.Y.S.2d 613, 618, 277 N.E.2d 641 (1971). The agreement states ". . . as and when profits . . . make funds available. . . ." Clearly in this new business venture context, where profits or losses are not guaranteed over any period of time, the parties intended that Simcoe first make profits before any payment became due pursuant to their agreement. Any interpretation that the parties only intended to identify the source of the funds for repayment is strained, unreasonable and unrealistic in light of the unequivocal and clearly convincing testimony on this score. Further, in considering all of the surrounding circumstances, the parties clearly intended that this agreement be conditional. Stradwick, who signed the agreement on behalf of Simcoe, admitted that the agreement reflected the discussions he had with Fogarty and that these discussions resulted in the understanding that there would be a conditional obligation to repay.[34]

Having determined that the agreement is conditional, we must next decide whether the condition has been fulfilled. Defendant argues that plaintiff has failed to sustain its burden of proving that it in fact generated "profits [from its] United States operation." We disagree. The annual reports of Simcoe's operation filed with the Georgia Department of Insurance reveal that by December 31, 1969 Simcoe had generated a net income of over $65,000 from its United States operations. Ernest Dodd, vice-president of Simcoe's parent corporation, admitted Simcoe did have profits from its United States operation. Clearly then the condition was met: Simcoe had the necessary funds to purchase the bonds as of December 31, 1969.[35]

\*     \*     \*     \*     \*

Even though we find that the October 23, 1967 agreement was conditional, and that the condition has been met, we are constrained to, and do, find that this claim for relief is barred by the statute of limitations.

In a contract action, the statute of limitations begins to run, and the claim for relief accrues, from the time of the breach. *John J. Kassner & Co. v. City of New York,* 46 N.Y.2d 544, 415 N.Y.S.2d 785, 788, 389 N.E.2d 99 (1979); *see, e.g., Haswell v. Haswell,* 84 Ga.App. 651, 67 S.E.2d 148 (Ga.Ct. App.1951); *Crump v. Christy,* 28 A.D.2d 1179, 284 N.Y.S.2d 472 (3d Dept. 1967). Where the contract is conditional, the statute of limitations begins to run only when the condition has been fulfilled. *Kassner, supra,* 415 N.Y.S.2d at 788. In the instant

---

**34.** Underwriters argues that the contract should be read to include an unconditional promise to repay. Plaintiff's Post-Trial Memorandum, pp. 33–35. However, we again note that Underwriters prepared the agreement and in this context the law is clear: "the contract will be construed most strongly against the one who prepared the agreement." *Brooke, supra,* 149 S.E.2d at 514. *See generally 67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184 (1975).

**35.** Because of this finding, and for other reasons set forth *infra,* plaintiff's argument that Simcoe breached an implied contractual condition to stay in business is totally without merit. The condition was met, and Simcoe simply did not repay Underwriters. Further, it is clear that Simcoe at present continues to generate business from operations in the United States. (T.T. 170) Plaintiff has completely failed to sustain its burden on this score. Further, any argument by plaintiff that later losses eliminated the aforementioned profits and thus precludes the condition from being met, only ignores the reality of the situation and the very wording of the agreement which it constructed.

action, the contractual condition was fulfilled (as heretofore stated) on December 31, 1969 and the statute of limitations began to run on that date.

The statute of limitations applicable to the agreement is six (6) years, Ga.Code § 3–705; N.Y.Civ.Prac. §§ 202, 213(2); see, e.g., Haswell, supra, and any claim for relief would have been time barred as of December 31, 1975—some four and one half years before the complaint was filed on October 1, 1980.[36] Therefore, unless there is some theory cognizable in law by which the statute of limitations is tolled or revived, plaintiff's claims are time barred.

Even assuming arguendo that the October 23, 1967 agreement was not conditional, any claim based on it would nevertheless be time barred. Plaintiff argues that any language suggesting a condition "is no more than a memorandum of understanding as to the source of funds of repayment." Plaintiff's Post-Trial Memorandum, p. 34. Even if we were to accept such a strained construction, which we emphatically do not (see supra ), we would be constrained to find that the claim for relief accrued at the date of signing, October 23, 1967, time barred as of October 23, 1973—almost seven years before the instant complaint was filed. See Haswell, supra, 67 S.E.2d at 149.

From our own independent review of the record,[37] we remain convinced, on the established and convincing facts and law applicable thereto, that plaintiff's claims are time barred. There was proof adduced at trial that Simcoe made three interest payments between June, 1978 and June, 1979. However, the mere fact of payment of interest is not sufficient to revive the statute. The rule is clear: "Mere partial payment in the absence of a writing is not sufficient." Bingham v. Advance Industrial Security, Inc., 138 Ga.App. 875, 228 S.E.2d 1, 2 (1976) (citation omitted); Garrett v. Lincoln Cemetery, Inc., 148 Ga.App. 744, 252 S.E.2d 650, 651 (Ga.Ct.App.1979); Ga.Code §§ 3–901, 3–903. Suffice it to say that no writing whatever, let alone one sufficient to constitute a new promise and thereby revive the statute of limitations, was introduced at trial.[38]

Plaintiff argues for its second claim for relief that a promise to repay can be implied from the surrounding circumstances and that this obligation exists separate and apart from the October 23, 1967 agreement. This argument too is without merit. Plaintiff's only legal support for this assertion is Fuqua National v. United States, 334 F.Supp. 1116, 1118–19 (S.D.Ga.1971). In Fuqua, the District Court was confronted with an action to recover income taxes paid under protest. The Court simply held that business transactions must be viewed with an eye toward substance above form; and that a promissory note given "For Value Received" (evidencing a non-taxable debt) also evidences a loan (which is taxable) for Internal Revenue Code purposes. We do not find the Fuqua decision at all persuasive.[39]

---

**36.** Defendant was served with the complaint on October 10, 1980.

**37.** Plaintiff has offered no factual or legal analysis on this issue whatsoever. We note that counsel for plaintiff stipulated to defendant's filing of an amended answer "... particularly limited to adding the affirmative defenses of statute of limitations and said amended answer shall date back to the date of the filing of the original answer." Order and Stipulation, filed February 5, 1981. That amended answer was filed on February 13, 1981.

**38.** Under New York law the same result would obtain. To revive the statute of limitations, "... it must be shown that the payment was [made] under circumstances amounting to a clearly demonstrated intention to pay the balance." Bernstein v. Kaplan, 67 A.D.2d 897, 413 N.Y.S.2d 186, 188 (2d Dept. 1979) (citations omitted), or that there was a writing acknowledging a new promise to pay. N.Y.Gen.Ob. Law § 17–101. Again, there was a total failure of proof on this score.

**39.** If plaintiff is arguing that there was an independent promise and that this promise was unconditional, we would be compelled nevertheless to find as we have. If a writing is intended to be the final and complete expression of the rights and duties of the parties, it is basic that "evidence [varying] the terms of an agreement in writing is not admissible." Kirtley v. Abrams, 299 F.2d 341, 345 (2d Cir. 1962); Ga.Code § 20–704(1). Here the agreement is. final and complete, and evidence is inadmissible to vary its terms.

*Conclusion*

Having meticulously reviewed the entire trial record and the law applicable thereto, we are again struck (as we were at the close of the trial) by the absolute failure of proof on key factual issues. Additionally, we are compelled to note that the fatal lethargy, almost tantamount to indifference, exhibited by Underwriters' commercial behavior throughout the several years (over a decade since its claims accrued) prior to the commencement of the instant action, permitted the Statute of Limitations to make a forcefully invincible entry with disastrous results.

Accordingly, we dismiss the complaint in all respects.

The foregoing constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.